OPINION OF THE COURT
Joseph Jaspan, J.
The individual defendants are health care professionals— two orthopedic surgeons, an anesthesiologist and a registered nurse. It is alleged that on July 3, 1975 they permitted a salesman of prosthetic devices to participate in a meaningful way in a surgical procedure then being performed at Smith-town General Hospital, without the consent or knowledge of the patient.
By reason thereof, these defendants and the hospital were indicted in October, 1977 and charged with acting in concert with each other in the commission of the crime of assault in the second degree, a felony, in violation of subdivision 5 of section 120.05 of the Penal Law.
By separate indictments, Dr. David Lipton, nurse Lorna Salzarullo and the hospital are charged with falsifying business records in the first degree (Penal Law, § 175.10) in that with intent to defraud, they omitted to make true entries in required reports in order to conceal the crimes of unauthorized practice of medicine and assault.
The defendants, other than Smithtown General Hospital, now move to dismiss the indictments against them upon the ground that the evidence presented and the legal instructions given to the Grand Jury were legally insufficient. All proceedings with respect to the hospital have been stayed pending disposition of a collateral matter now pending before the Appellate Division.
*738 THE INDICTMENT FOR ASSAULT
The defendants in support of their motion to dismiss urge, inter alia, that:
1. The legislative intent was to limit subdivision 5 of section 120.05 of the Penal Law to cases involving the administering of a drug causing stupor or unconsciousness for the purpose of permitting another crime to be committed on the victim and that the present "tortured” use of this section was dictated because prosecution under section 6512 of the Education Law, the unauthorized practice of medicine statute, was barred by the two-year Statute of Limitations.
2. The anesthetic was administered with the consent of the patient for a lawful purpose which was not thwarted by a subsequent and impromptu determination to use technical assistance. No criminal intent may be inferred from such conduct.
3. That, in any event, there was an emergency within the meaning of subdivision 4 of section 6527 of the Education Law and that the use of the services of the technician was therefore permitted and lawful.
4. In addition, the individual defendants, other than Dr. Lipton, urge that they were in supportive roles limited to the directions of the surgeon, all in the interests of the patient’s welfare, and therefore they cannot be deemed to have intentionally joined or acted in concert in the commission of any crime.
The evidence presented to the Grand Jury included the following:
On the morning of July 3, 1975, Dr. David Lipton assisted by Dr. Harold Massoff performed a total hip arthroplasty on a consenting patient. The procedure is described as follows: "They opened up the patient’s right hip in this case and they removed the neck of the femur. They reset the greater trochanter, reamed out the acetabulum cavity. They take methacrylate bone cement implant that in the acetabulum, put a cup into the cement then they broach out the femur canal, put in the methacrylate cement there, take the Charnley prosthesis, insert that down into the cavity, réapproximate the greater trochanter and sew him up.”
Instrumentation was supplied by William MacKay, the general sales manager of the company which sold the Charnley-type prosthesis used for that purpose. Mr. MacKay was *739 present in the operating room during most of the operation which began at 8:00 a.m., leaving at 11:30 a.m. After the operation was completed, the patient was X-rayed and it was found that the "head of the femur popped out of the acetabulum” or as expressed by a witness "the joint was dislocated”.
At the request of Dr. Lipton, an urgent call was placed for Mr. MacKay to return to the hospital. He was located at a golf course in Port Jefferson and upon his return he scrubbed, entered the operating room in time to observe Dr. Massoff reopen the hip. After Dr. Massoff had tried unsuccessfully with a mallet to remove the prosthesis, Mr. MacKay offered to and did take it out with the use of the same instrument. Dr. Massoff then left to return to his office.
In an effort to clean out the cement so that he could reinsert a new prosthesis, Dr. Lipton fractured the femur. The result was described by Mr. MacKay as a "mess”. The tension in the operating room mounted. At this point, Dr. Lipton was "making overtures about doing a girdle stone procedure”. He was dissuaded from that course by Mr. MacKay who stated that he could fix the "thing” and put it back. With the consent of Dr. Lipton, he sat down on a stool and removed the cement which had cured in the shaft. He did that with tiny curettes in a careful procedure which took him about three and a half hours picking it out piece by piece. During this period Dr. Lipton walked away from the table and may have even walked out of the room at one time. In addition, Mr. MacKay treated the problem created by the fracture and he describes his procedure as follows:
"Q How did you fix the fracture?
"A As I said, I reapproximated all the fragments and I took what are called parabands which are little flat pieces of metal about eight inches long and I ran them around the femur in two places and then I had Dave Lipton mix up a batch of cement for me. We put cement down the shaft and I held the shaft together with lowman [phonetically] bone clamps because when you put the cement in you create a compressive force from inside. I put the prosthesis down in it, let it cure and put wire around it and the fracture was reduced.
"Q Did you put the rest of the prosthetic device in or did Doctor Lipton?
"A I did.”
The operation concluded at about 5:00 or 5:30 p.m. The *740 anesthetic was administered and monitored by Dr. Mary Chiu during the entire day and at no time was the patient made aware of the foregoing events.
Incidentally, Mr. MacKay had never attended high school or college and had no training in paramedical techniques. His knowledge came exclusively from reading orthopedic journals, looking at training films and from implanting prostheses in cadaver bones as a training exercise.
The practice of medicine is defined in section 6521 of the Education Law as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition”.
From the evidence presented, the Grand Jury could conclude that the salesman, William MacKay unlawfully engaged in the practice of medicine without the prior informed consent of the patient under circumstances which did not constitute an emergency.
Emergency has been defined as an unforeseen combination of circumstances which calls for immediate action and is synonymous with crisis, pinch, strait, necessity (Lutzken v City of Rochester, 7 AD2d 498), and as an unforeseen occurrence or combination of circumstances which calls for immediate action leaving no time for deliberation (Helvich v Rutherford Co., 96 Ohio App 367).
While Dr. Lipton may have been operating under stress, no emergency situation is depicted by the available testimony. There was time for deliberation and the application of available skills. No attempt was made to enlist the aid of other licensed personnel or seek the recall of Dr. Massoff during the three and one-half-hour effort by Mr. MacKay. Dr. Lipton abdicated his role as surgeon in that operating room and permitted the judgment and skills of a layman to prevail. Mr. MacKay’s involvement in the surgical procedure extended far beyond instruction as to the use or manner of implant of the device he sold.
The Grand Jury could further find that the continuing application of an anesthetic over a lengthy period of time to maintain unconsciousness triggered the application of subdivision 5 of section 120.05 of the Penal Law just as effectively as if the patient had intermittently and alternately awakened and succumbed. The result is the same — the subject had lost his power to know or resist.
*741 If deception is a necessary element, as urged by defense counsel, it could have been found to be. inherent in the application of an anesthetic during the course of a surgical procedure performed by a layman — an event not contemplated by the consent previously given.
Nevertheless, a serious question arises as to whether there was an assault.
Subdivision 5 of section 120.05 of the Penal Law reads as follows:
"A person is guilty of assault in the second degree when: * * *
"5. For a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to him, without his consent, a drug, substance, or preparation capable of producing the same.”
The practice commentary states that this subdivision 5 partakes of and partially restates the substance of three separate provisions or offenses of the former Penal Law (§ 242, subds 1, 2; § 1752) aimed at the unlawful administering of dangerous, noxious or stupor producing drugs. It adds "the instant subdivision would apply more typically to the administering of 'knockout drops’ for the purpose of rendering a person temporarily unconscious so that his wallet may be more easily stolen”. (Hechtman, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, p 342.)
These source sections prohibit possession of an anesthetic substance by a person other than a duly licensed physician or surgeon with intent to administer same to a nonconsenting patient "unless by direction of a duly licensed physician” (§ 1752); and defines assault in the second degree as including the administering of an anesthetic agent with intent thereby to enable or assist in the commission of any crime (§ 242, subd 2). Subdivision 1 of section 242 is not relevant to the issues herein.
The statute under review and its historical precedents are directed to a misuse of an anesthetic. That is the injury necessary to constitute an assault. It is defined in subdivision 5 of section 120.05 as its use "for a purpose other than lawful medical or therapeutic treatment”.
The court’s attention has been called to a similar statute in Illinois (Criminal Code of 1961, § 12-4, subd [c]) for which the *742 legislative intent was expressed as follows: "The third category of aggravated battery is embodied in subsection (c) and covers the unusual type of battery which usually precedes a more serious offense such as rape, robbery or even murder. It is also designed to reach the deceptive inducing to drug addiction without the victim’s consent.” (Committee Comments to Illinois Criminal Code of 1961, § 12-4, subd [c].)
The injury, within the meaning of the quoted section is the application of the anesthetic upon a nonconsenting person "for a purpose other than the lawful medical or therapeutic treatment”.
But the object of all parties in this case was to improve the condition of the patient by the implantation of a total hip. In fact, the conduct of the defendants, however ill-advised, was designed in good faith to achieve that result. A lawful aim may have involved an unlawful performance which does not reflect adversely upon the intent of the parties involved. Lawful medical treatment was not thereby transformed into unlawful medical treatment.
Expressed in other language, the defendants did not act with the mental culpability required for the commission of the crime of assault. Mens rea was not established.
The statute may be broadened by legislative action but not by judicial fiat. The conduct involved may encourage a malpractice suit — but was not by its nature or intent a criminal assault upon the patient.
I conclude therefore that the evidence presented was not legally sufficient to warrant the indictment of the defendants for assault in the second degree.
It becomes unnecessary therefore to treat with the legal implications of the limited and well-defined roles of the nurse and the anesthesiologist. Except as indicated below, they performed their functions as required by law and practice, acting in aid of and at the directions of the operating surgeon in a manner designed to achieve the ultimate and lawful purpose of the total hip arthroplasty procedure.
The role of Dr. Harold Massoff is not so easily categorized, but in view of the finding herein need not be further explored.
The motion to dismiss the indictment charging assault in the second degree as against the moving defendants is granted. The ruling will also apply to Smithtown General Hospital if and when this court is free to issue such a ruling.
*743 FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE
This crime is set forth in section 175.10 of the Penal Law and reads as follows: "A person is guilty of falsifying business records in the first degree when he commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof.”
Section 175.05 referred to therein provides:
"A person is guilty of falsifying business records in the second degree when, with intent to defraud, he:
"1. Makes or causes a false entry in the business records of an enterprise; or
"2. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or
"3. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or
”4. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.”
Indictment No. 2051-77 charges that the defendant Lipton between July 3, 1975 and August 26, 1975 with intent to defraud and to conceal the crimes of unauthorized practice of medicine and assault omitted to make a true entry in his operative report, also known as the surgeon’s report, in that he did not refer to participation of a person not licensed to practice medicine.
A similar Indictment No. 2050-77 was returned against the supervising nurse, Lorna Salzarullo, and the hospital and refers to a failure to make a true entry in the operating room register also known as the operating room log.
In each indictment it is charged that the conduct of the defendants was in violation of a duty imposed upon them by law or the nature of their positions.
In 1975 the code provisions governing the organization and administration of a hospital were set forth in Part 720 of title 10 of the Official Compilation of Codes, Rules and Regulations of the State of New York as established pursuant to the provisions of section 2803 of the Public Health Law.
In 10 NYCRR 720.13 (g) there is the requirement that a register of operations be maintained in a bound book in the operating suite which should include the following information for each surgical procedure performed:
*744 "4. Name of surgeon, anesthetists, assistants and nurses;
"5. Surgical procedures performed and anesthetic agents used; and
"6. Complications of surgery.”
There is a further requirement (10 NYCRR 720.20 [j]) that the hospital maintain a medical record department under supervision of a medical record administrator or other qualified person and that a complete medical record be maintained including surgical reports which "shall be completed promptly, authenticated and signed by a physician”.
The testimony of the chief of surgery of the Smithtown General Hospital and a representative of the Suffolk County Department of Health Services includes statements that the surgeon’s report should list the name of his assistants as well as a statement of the complications that may have occurred.
The evidence presented to the Grand Jury, if uncontradicted or unexplained, would support a finding that:
(a) William MacKay unlawfully practiced medicine in Smithtown General Hospital on July 3, 1975 with the consent of the defendant Lipton and in the presence of the defendant Salzarullo;
(b) The treatment was not in response to an emergency or that, in any event, the emergency did not continue during the entire course of the afternoon;
(c) The surgeon’s report of Dr. Lipton referred only to a "crack” in the femur rather than a fracture and made no reference to William MacKay or the role he played in reducing the fracture and reimplanting the prosthesis;
(d) The register of operations prepared from information submitted by defendant Salzarullo listed Dr. Massoff as an assistant to Dr. Lipton, but made no reference to William MacKay;
(e) That each of the individual defendants prevented or caused the omission of a true entry (People v Rabenold, 287 NY 832); each made or caused a false entry by reporting there' was only one assistant, Dr. Harold Massoff. To the extent that the defendant Salzarullo provided information for the log entries, she caused the omission of a truthful statement;
(f) That the failure to make the MacKay references concealed the crime of unlawful medical practice and that intent may be inferred from the results produced. It makes little *745 difference that another motivation might have been protection against a malpractice suit.
The charge to the jury adequately covered the need for corroboration of accomplice testimony. While the charge made no reference to the emergency exception, it was not fatal to the presentation in view of the conclusions reached in this decision and the evidence presented to the Grand Jury as to the emergency exception and the course to be followed in such an event.
In view of the fact that there was sufficient evidence to sustain these indictments, the failure to so charge did not impair the integrity of the proceeding or prejudice the defendant. (People v Dearstyne, 50 AD2d 1029, 1030.)
I find the evidence legally sufficient to support each of these indictments with respect to the individual defendants. For the reason indicated supra, no finding is made with respect to the hospital itself.
CONCLUSION
The motion to dismiss Indictment No. 2052-77 charging assault in the second degree as against each of the individual defendants is granted; motion to dismiss Indictment Nos. 2050-77 and 2051-77 charging falsifying business records in the first degree is denied.
The surviving indictments will appear on the trial calendar of March 1, 1978.