679 P.2d 1123
**STATE of Idaho, Plaintiff-Appellant,**

v.

**Victor A. HAWORTH and Wayland Cowan, Defendants-Respondents.**

**No. 13989.**

Supreme Court of Idaho.

March 19, 1984.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-appellant.

Rolf M. Kehne, Ada County Deputy Public Defender, Boise, for defendants-respondents.

HUNTLEY, Justice.

An Idaho State Police officer observed an automobile traveling slowly, at 10:00 o'clock at night, coming from Eagle, Idaho, a small town unprotected by law enforcement. The trunk lid was up, and the officer observed a large object in the trunk which weighted the rear end down. The officer stopped the vehicle, in which both defendants were occupants.[1] As a result of the stop, evidence was obtained upon which basis the defendants were charged with six robberies in Ada County. The district court ruled that the stop of the automobile was an "improper investigative stop," and therefore granted defendants' motion to suppress the evidence. The state has appealed.

At issue is whether the stop of the automobile violates the fourth amendment to the United States Constitution.

■ A threshold issue is whether defendants have standing to challenge the

---

1. We have previously considered this incident, although based upon a different record, a differ-ent issue, and different charges. *See State v. Cowan*, 104 Idaho 649, 662 P.2d 230 (1983).

investigatory stop of the vehicle. The officer testified that the defendants were not free to leave, and it seems obvious that a stop of a vehicle on an open highway at night is necessarily a stop of the occupants inside the vehicle. "[S]topping an automobile and detaining its *occupants* constitute a 'seizure' within the meaning of [the fourth amendment], even though the purpose of the stop is limited and the resulting detention is quite brief." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (emphasis added). The personal rights of both Cowan as passenger and Haworth as driver "to the possession and control of his own person, free from all restraint or interference from others," *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), were infringed upon by the investigatory stop. Therefore, both have standing to contest the reasonableness of the stop.

The district court correctly noted that this was a "seizure" within the meaning of the fourth amendment, and the state has the burden of proving the proper justification for such a seizure. *See Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Allgood,* 98 Idaho 525, 567 P.2d 1276 (1977). The standard which the state must satisfy in order to justify an investigatory stop was recently reviewed and clarified in *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). *See also State v. DeMasi,* 419 A.2d 285 (R.I.1980) (illegal stop of vehicle with heavily laden trunk), 452 U.S. 934, 101 S.Ct. 3072, 69 L.Ed.2d 948 (1981) (reversed and remanded for reconsideration in light of *Cortez*), 448 A.2d 1210 (R.I.1982) (decision after remand). The Supreme Court in *Cortez* conceded that the standard is an "elusive concept" and went on to state that "the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *Supra* 449 U.S. at 418, 101 S.Ct. at 695. The court clarified the "totality of the circumstances" or the "whole picture" standard as follows:

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person. "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior, jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

Since the district court in the present case did not have the benefit of the decision in *Cortez,* and since we are uncertain whether the district court would consider its one-paragraph memorandum decision to be its evaluation of the "totality of the circumstances—the whole picture," we reverse and remand this case to the district court for reconsideration under the standards set out in *Cortez.* The facts as stated in this opinion are merely narrative and are in no way intended as binding upon the district court as the ultimate factfinder on the issue presented.

If the district court should find the vehicle stop to be non-violative of the fourth amendment, it would then be required to make additional findings of fact relevant to whether defendants have standing [2] to contest the subsequent searches of the vehicle and relevant to the proper justification for such searches.

Reversed and remanded.

DONALDSON, C.J., and BAKES, J., concur.

SHEPARD, J., concurs in the result.

BISTLINE, Justice, dissenting.

## I.

What may have gone on unnoticed in my *Lang* opinion [1] was a disappointment in this Court's immediate jump from the *Aguilar-Spinelli* rule to the "totality of circumstances" rule of *Gates*.[2] Other than that this Court wholly ignored that there was no evidence whatever of Orlando, Florida, being a hot-bed of drug activity, whereas in truth and in fact it was Miami, Florida, which was so branded in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), I would have been able to concur in affirming in *Lang*. But, I was unable to do so where this Court's opinion was *solely* based upon *Gates*—in which case the High Court itself carelessly, or perhaps intentionally, misread its own *Mendenhall* case in declaring the entire state of Florida as a main source of drugs.

In *Lang* I hoped to persuade the other members of the Court to some degree of caution before precipitately embracing as our own the decisions of the High Court. My main premise in *Lang* was that prior to *Aguilar*, prior to *Spinelli*, and prior to *Gates*, we had our own Supreme Court case

law interpreting and applying our own Constitution and our own legislative enactments embodying the search and seizure provisions of that Constitution. I pointed out that long before the High Court became active, this Court in 1927 ruled that the affidavit offered in support of a requested warrant "must set forth and disclose some personal knowledge of the underlying facts; the conclusions to be drawn therefrom are for the magistrate .... *State v. Arregui*, 4 Idaho 43, 254 P. 788 (1927)." *Lang*, 105 Idaho at 687, 672 P.2d at 565. It may be noted that in *Lang*, 105 Idaho at 691, 672 P.2d at 569, I also intimated that the totality of circumstances, as the High Court so called its *Gates* principle, probably had been the rule in Idaho, and a just concern was that this Court was remiss in not "giving any due consideration to continuing with a rule which prior to *Aguilar-Spinelli* well implemented our Idaho Constitution, ... and ... would better serve the magistrates of Idaho and better serve its people."

## II.

Putting aside *Lang* and *Gates*, and having revisited those cases only prefatorily to discussing today's case, I repeat only that it was the Supreme Court of Idaho, not the police officer's affidavit, which averred that all of Florida, presumably including Orlando, is a source of narcotics. Today, as a natural and not unexpected sequel to the Court's *Lang* opinion adopting the *Gates* view, this Court, again dancing to the federal fiddle, now brings down on the people of Idaho the "totality" principle of the High Court's *Cortez*.

While the Court's unnecessary change of direction in *Lang* was disturbing, I continue to see no substantial problem with the magistrates of Idaho being informed that

---

2. Distinguish standing to contest a stop of a vehicle from the standing required to contest a *search* of a vehicle. The latter requires that the defendant "must demonstrate some proprietary interest in the premises searched or some other interest giving [the defendant] a reasonable expectation of privacy." *State v. Cowan*, 104 Idaho 649, 651, 662 P.2d 230, 232 (1983). *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d

387 (1978); *State v. Bottelson*, 102 Idaho 90, 625 P.2d 1093 (1981).

1. *State v. Lang*, 105 Idaho 683, 672 P.2d 561 (1983).

2. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

that which they have previously done under our statutes and our *Arregui* case is henceforth denominated as a "totality of circumstance" determination. It is enough that the magistrates continue to insist on being supplied with the underlying facts, and that the conclusions to be drawn from those facts are for the magistrate to draw—not the officer. In that regard I am fortified by the well-considered views of Charles H. Whitebread:[3]

> "The Court also noted that a strict application of the *Spinelli* 'two-pronged test' would virtually destroy the usefulness of anonymous tips, which frequently contribute to the solution of otherwise 'perfect crimes.' For these reasons the Court held that it would be wiser to abandon the 'two-pronged test' established by *Aquilar v. Texas*, 378 U.S. 108 [84 S.Ct. 1509, 12 L.Ed.2d 723] (1964) and *Spinelli*. *In its place the Court reaffirmed the totality of the circumstances analysis that traditionally has governed informed probable cause determinations. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... concluding' that probable cause existed.*"

Whitebread, p. 6 (emphasis added).

Professor Whitebread continued with an analysis of *Gates* which should be as equally helpful to Idaho's magistrates as his conclusion that magistrates post-*Gates* will basically function as they did pre-*Gates:*

> "The Court noted that in the present case the corroboration of the letter's predictions that the Gates' car would be in Florida, that Lance Gates would fly to Florida in the next day or so, and that he would drive the car north toward Bloomingdale all indicated, albeit not with certainty, that the informant's other assertions were true, and this provided a sufficient basis for the magistrate's probable cause finding and decision to issue the warrant. The anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. The letter writer's accurate information as the travel plans of each of the Gates was of a character likely obtained only from the Gates themselves, or from someome familiar with their not entirely ordinary travel plans. If the informant had access to accurate information of this type, a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gates' alleged illegal activities." *Id.*[4]

Professor Whitebread apparently did not, however, look back to *Mendenhall* to verify the *Gates* court's statement that "Florida is a well-known source of narcotics and other drugs"—which Justice Powell most assuredly did not so state in *Mendenhall.*

### III.

It is one thing for this Court to have specifically adopted the *Gates* "totality of circumstances" principle rather than to

---

3. Charles H. Whitebread, George T. Pfleger Professor of Law, University of Southern California Law Center, *Recent Decisions of the United States Supreme Court, 1982–1983 Term,* Washington, D.C.: American Academy of Judicial Education, 1983.

4. The language of *Gates* which should continue to guide magistrates is this:

   "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued."
   *Gates,* 103 S.Ct. at 2332.
   This compares favorably to the language of *Arregui* set out above.

have remained faithful to our own Idaho case law, and no great harm ensure therefrom—which I am able to say because of a confidence that our Idaho magistrates will generally continue to require that which they have been requiring. But it is another thing for this Court, using its *Lang* opinion as a springboard, to hop aboard the High Court's "totality" doctrine in reviewing the actions of police officers. These are vastly different situations.

Those who saw the *Lang* opinion as inimical to the constitutionally protected rights of the people of Idaho as a "one," on a scale of one to ten, will see today's adoption of *Cortez* as a "ten." Nor need one research what was said in the *Cortez* opinion beyond what is set forth in today's opinion by the Court. Unfortunately, however, the reader of the excerpt will not realize that in *Cortez* the officers in question were Border Patrol officers patrolling a sparsely populated section of southern central Arizona who found human footprints in the desert, who later in time discovered similar footprints in the same area, from which it was "deduced that on a number of occasions groups of from eight to twenty persons had walked north from the Mexican border, across thirty miles of desert and mountains, over a fairly well-defined path, to an isolated point on Highway 86, an east-west road running roughly parallel to the Mexican border." The officers on being so alerted to the extreme likelihood of illegal entry into the United States which involved a vehicle capable of picking up the surreptitious visitors to the United States at an established point, conducted further surveillance of the area was made, and resulting from a stakeout a certain "distinctively colored pickup with a camper shell" was observed going toward the apparent pick-up site at *4:30 a.m.,* which on its return trip at 6:12 a.m. was stopped, and found to have in the camper six illegal aliens—a violation of 8 U.S.C. § 1324(a) by the two defendants who were carrying on the operation, and so charged, and so convicted, following the denial of a suppression motion. A 2–1 panel of the Court of Appeals of the Ninth Circuit reversed the convictions on the basis that the stop was unjustified. The dissenting opinion of Judge Chambers lays out in greater detail than have I, or did the Court's opinion in *Cortez*, the amassed evidence which prompted the stopping of the pickup truck.[5] Judge Chambers made short shrift of the majority opinion:

> "The officers put together a series of suppositions drawn from their specialized experience in investigating alien smuggling along the Arizona border with Mexico. Each of these suppositions proved to be totally founded in fact. But the majority says that it was unfounded in law. The majority says it was a blind hunch. I call it responsible police work."

*Cortez,* 595 F.2d at 508.

Having said the foregoing, Judge Chambers proceeded with the appended details, the reading of which is an absolute must for those interested in comparing the High Court's *Cortez* with the use made of its rather gratuitous statements in this Court's opinion issued today. Judge Chambers was entirely correct; the other two judges were wrong, and the High Court could have and should have merely adopted the views of Judge Chambers, which ultimately it did do in concluding its opinion with the following paragraph:

> "We have recently held that stops by the Border Patrol may be justified under circumstances less than those constituting probable cause for arrest or search. *United States v. Brignoni-Ponce,* 422 U.S., at 880, 95 S.Ct., at 2579. Thus, the test is not whether Officers Gray and Evans had probable cause to conclude that the vehicle they stopped would contain 'Chevron' and a group of illegal aliens. Rather the question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in

---

5. Because of the importance of this case in the administration of criminal justice in Idaho, detailed chronology is appended hereto, verbatim from Judge Chambers' opinion.

criminal activity. On this record, they could so conclude."

*Cortez*, 101 S.Ct. at 697, 449 U.S. at 421–22 (footnote omitted).

Better, however, to take note that Justice Stewart, who with Justice Marshall not joining the Court's opinion, condensed into two paragraphs all that needed to be said in reversing the Court of Appeals:

"The Border Patrol officers in this case knew, or had rationally deduced, that 'Chevron' had repeatedly shepherded illegal aliens up from the border; that his treks had commonly ended early in the morning around milepost 122 on Highway 86; that he usually worked on weekends; that he probably had made no trips for two weeks; and that trips were most likely when the weather was good. Knowing of this pattern, the officers could reasonably anticipate, even if they could not guarantee, the arrival of another group of aliens, led by Chevron, at milepost 122 on the first clear weekend night in late January 1977. Route 86 leads through almost uninhabited country, so little traveled in the hours of darkness that only 15 to 20 westbound vehicles passed the police during the five hours they watched that Sunday night. Only two vehicles capacious enough to carry a sizable group of illegal aliens went by. One of those two vehicles not only drove past them, but returned in the opposite direction after just enough time had elapsed for a journey to milepost 122 and back. This nocturnal round trip into 'desolate desert terrain' would in any

event have been puzzling. Coming when and as it did, surely the most likely explanation for it was the Chevron was again shepherding aliens.

"In sum, the Border Patrol officers had discovered an abundance of 'specific articulable facts' which, 'together with rational inferences from [them],' entirely warranted a 'suspicion that the vehicl[e] contain[ed] aliens who [might] be illegally in the country.' *United States v. Brignoni-Ponce*, 422 U.S. 873, 844, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607. Because the information possessed by the officers thus met the requirements established by the *Brignoni-Ponce* case for the kind of stop made here, I concur in the reversal of the judgment of the Court of Appeals."

*Cortez*, 101 S.Ct. at 697, 449 U.S. at 422–23.

Legal minds agreeing with the concluding paragraph of *Cortez*, and with the views of Justice Stewart and Judge Chambers, will be disturbed that the High Court went far beyond the necessary to make those remarks which are now set forth in this Court's majority opinion (and which I footnote below for continuity of this writing).[6] What appears to be particularly objectionable is the suggestion that, although the language is couched in terms of "trained officers" and their abilities as compared to "untrained persons" the implication is there, because of the lack of any definition whatever as between trained and untrained officers, that *all* officers are "trained" as contrasted with "untrained persons."

**6.** " 'The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

" 'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practi-

cal people formulated certain common sense conclusions about human behavior, jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

" 'The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.' *United States v. Cortez*, 449 U.S. at 418, 101 S.Ct. at 695."

From there the leap is made to the more frightening language borrowed from *Cortez* that "the evidence thus collected must be seen and weighed ... as understood by those in the field of law enforcement." That statement, taken at face value, tells the country's trial judges that it is not for them to determine the validity of an investigative stop beyond ascertaining *whether the particular law enforcement making the stop viewed his own decision as justified,* i.e., did an assessment of the whole picture "yield a particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing." *Cortez,* 101 S.Ct. at 695.

Anyone reading the underlying of facts of *Cortez* will see that the Border Patrol officers in that case were trained, indeed specially trained, officers who knew what they were about. "Two weeks earlier, one of the officers had personally tracked Chevron along this route for more than 22 miles. *Both officers were unquestionably well-trained as trackers." Cortez,* 595 F.2d at 505 (Chambers, J., dissenting).

No one should quarrel with that view. For certain I do not, but moreover note the illumination it puts on the High Court's use of the occasion to paint with the extremely broad brush the language which this Court today adopts as its own.

### IV.

The majority today, as I understand its opinion, is reversing Judge Newhouse *not* because of any error committed by him, but simply to ascertain if he might perchance change his ruling on the basis of the *Cortez* "totality of the circumstances" doctrine. This, too, is another strange turnabout. Judge Newhouse made his ruling on December 1, 1980. The State appealed from his ruling on December 10, 1980. As the majority concedes, at that time the High Court's *Cortez* opinion had

not been announced, and this court, of course, had not embraced it. Simply stated, *Cortez,* and in turn today's opinion in this case, were not the law in December of 1980 when Judge Newhouse ruled and the State appealed. Most judges and practitioners will recognize a retroactive application of the law when they see one. Today such is exactly what they see, and most will be as startled as am I. The cases of *Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977), and *Ivan v. City of New York,* 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972), make it clear that retroactivity effect not be given to new constitutional doctrine unless the purpose of the new rule is to enhance the integrity of the factfinding process.[7] The rule otherwise is in favor of a defendant, not the State, and in admittedly short research I came across no case which allows the State to later, on appeal, claim the benefit of the holding in an opinion which came into existence after it has appealed a trial court's ruling. Here, of course, whether it were the defendant or the State who post-decision would claim the benefit of *Cortez,* it cannot be said in the slightest that application of *Cortez* to the issue before Judge Newhouse would affect the integrity of the factfinding process— none of the facts being in dispute. Today's direction by the Court to Judge Newhouse cannot help but remind of the first disposition of the first *Creech*[8] case where on rehearing the views of Justice Bakes ultimately prevailed in *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979); *see also State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979), over the views of Justices Donaldson and Shepard that it was not impermissible to retroactively apply a death penalty statute not in effect when Creech and Lindquist were tried and convicted, *Lindquist,* 99 Idaho at 776, 589 P.2d 101 (Donaldson and Shepard, JJ., dissenting). The confusion which attends the majority opin-

7. Since writing the foregoing, the opinion in *Solem v. Stumes,* — U.S. ——, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), has come to my attention. That opinion confirms my views of *Hankerson.* If a defendant may not have the retro-active benefit of a non-truthfinding function in a criminal trial or proceeding, it is to be much doubted that the State nevertheless may have.

8. *State v. Creech,* 24 I.C.R. 779 (1977).

ion may stem from a failure to note that in *Lang* the magistrate issued the search on the magistrate's evaluation of the underlying facts presented by affidavit. The High Court's *Gates* opinion merely fortified that determination insofar as the *Lang* defendant's Fourth Amendment rights were concerned. It is otherwise with *Haworth*, however. The ruling invalidating the investigatory stop was in his favor, not the State's, and a reversal cannot be made for the stated purpose of a re-examination of the issues in light of the language of a case handed down after the ruling, and after it had been appealed from.

Nor is there any concern here that the defendant Haworth would escape the penitentiary by Judge Newhouse's ruling. If memory serves me correctly, we were informed at oral argument that he now is and has been for some time incarcerated in the penitentiary serving time for other crimes.

As has been said, the majority points to no error in the decision of Judge Newhouse. Succinctly and to the point, and properly applying Idaho case law, he ruled as follows:

"The Court, after considering both defendants' Motion to Suppress, grants the same. The Court is of the opinion that the initial stop by Dennis E. Goines, of the Idaho State Police, was an improper investigative stop under the doctrines enunciated by the Idaho and United States Supreme Courts. See *State v. Algood*, 98 Idaho 525 [567 P.2d 1276], *Terry v. Ohio*, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889], *Adams v. Williams*, 407 U.S. 143 [92 S.Ct. 1921, 32 L.Ed.2d 612], *State v. Hobson*, 95 Idaho 920 [523 P.2d 523], and *Delaware v. Prouse* [440 U.S. 648] 99 S.Ct. 1391 [59 L.Ed.2d 660]. *Officer Goines saw an automobile, traveling too slow, at ten o'clock at night, coming from Eagle, Idaho, a small town inadequately protected by law enforcement, with an overweight trunk.* No law was being violated by the vehicle. This certainly is not such unusual conduct as to lead to the reasonable conclu-

sion that criminal activity may be afoot. We certainly have a lucky search on the part of the law officer. Ordinarily he would only find somebody carrying heavy goods in the trunk of his car." R., p. 66 (emphasis added).

Notwithstanding that the underlined portion of the excerpt does contain the "totality of the circumstances" which precipitated the officer to make the stop—poles apart from the complete "totality" of the comprehensive and extensive investigation of the Border Patrol officer in *Cortez*, this Court's majority improperly directs Judge Newhouse to do again that which he has already done. Being shown no error in that ruling, I would affirm it. For certain I would not emburden an already over-burdened criminal justice system by directing Judge Newhouse to rule again where, should he see no difference between his decision of December, 1980, and the *Gates* doctrine of January, 1981, his order may again be appealed on the thought that thereafter the High Court might again change the rules of the game, *ad infinitum.*

## APPENDIX

"The officers testified that they knew from official reports from their colleagues, and from personal investigation on their own part, that a guide whose shoes bore a distinctive chevron design was leading groups of aliens across the border along a well-defined route. It began near the border town of San Miguel, passed through the Baboquivari Valley, and ended at an area between Mileposts 114 and 122 on Highway 86, less than 30 miles north of the border. Two weeks earlier, one of the officers had personally tracked Chevron along this route for more than 22 miles. *Both officers were unquestionably well-trained as trackers.* They could tell that Chevron was probably of Latin descent, that he usually led groups of from 8 to 20 aliens, and that they never meandered but proceeded by forced march in a determined manner. From this the officers drew the reasonable conclusion that Chevron was a professional and that the aliens were not mere tran-

sients. The officers knew from their experience that professional smugglers in this particular area always work at night, and Chevron's tracks indicated that he traveled at night. The officers knew that border crossings were preferably made in good weather, when the sky is clear and there is good moonlight. They also knew that Chevron preferred to travel on or near weekends.

"The night in question was the first clear night after a rainy three-day period that had included a weekend. The officers' primary responsibility that night was watching the junction of Route 286, running north from Sasabe, with Route 86 at a location called 'Three Points'. Obviously the officers did not *know* that Chevron would be crossing that night, but both, in their experience, believed that he would attempt it that night. They therefore decided to watch not only the junction with Route 286, but also to keep watch for any vehicle or vehicles that might be used to pick up aliens from the vicinity of Mileposts 114 to 135. Their car was stationed off the road very close to Milepost 149 on Route 86, or about 27 to 35 miles east of the vicinity where Chevron was known to bring his groups.

"They computed the distance to be traveled on foot by the aliens and estimated that if Chevron did not cross the border until dark, then the trip could not begin before 6 p.m. On a forced march he would arrive at the pick-up area no earlier than 2 a.m. and no later than 6 a.m. The officers therefore gave special attention to these morning hours. Furthermore, they knew that if Chevron brought a group of between 8 and 20 (which was his pattern), he would have to be met by a vehicle capable of carrying that number of people. They knew that campers were widely used for this purpose by professional smugglers; they therefore gave close attention to campers traveling on Route 86 during these hours.

"The officers were particularly on guard for vehicles traveling in a westward direction on Route 86. They obviously could not be sure that a pick-up vehicle would be traveling in that direction, but they articulated clearly their reasons for believing that this would be the direction that would be followed. On prior trips, after reaching Route 86, Chevron had always led his groups on foot along the side of the road *in an eastward direction.* From this the officers reasonably assumed that the group would be walking *toward* and not away from their ultimate destination. Otherwise, after an arduous, forced nighttime march of over 25 miles, they would be walking *away from* the vehicle that was coming to meet them. And they would be walking with their backs to the approaching vehicle, not facing it in a position to identify the oncoming traffic.

"At about 4:30 a.m. the officers saw a yellow-green camper, with a license beginning 'GN–88', traveling west on Route 86. About 20 minutes later they saw another camper (license not visible) also traveling west. They were suspicious of both. These were the only vehicles which aroused their suspicion, out of the 12 to 20 westbound vehicles that passed during those morning hours. Others did not meet the profile that they knew from experience were vehicles used to pick up smuggled aliens. They estimated that it would take about an hour and a half to drive the 27 to 35 miles to the pick up area, find the aliens, load them, and return to Milepost 149. One hour and forty minutes later, at 6:12 a.m., the yellow-green camper reappeared at Milepost 149, now heading east. Faced with the decision of letting it pass, or stopping it to make a brief inquiry, the officers decided to stop it. The majority say they should have let it drive on.

"A little must be said of the nature of the terrain in this part of Arizona. We can take judicial notice that the major east-west artery in southern Arizona is Interstate 10 which approaches Tucson from the east and then continues west to Casa Grande where it becomes Interstate 8, and continues west to Gila Bend and Yuma.

"Route 86, on the other hand, is a much smaller and less traveled road forming a

wide southwesterly arc from Tucson on the east to Gila Bend on the west. Leaving Tucson it heads southwest into the southern portion of the Papago Reservation and generally parallels the Mexican border. It then joins Route 85 which goes northwest to Ajo and Gila Bend. The testimony is that this is desolate desert terrain, interspersed with mountain ranges. In its less than 10 miles of length it goes through only one area of any population—the Indian village of Sels, which according to the 1970 census had a population of 750. The area south of Route 86, between the Baboquivari and La Lenza Mountains, has less than 100 scattered residents. It was through this area, notorious for alien smuggling, that Chevron was bringing his groups.

"The portion of Route 86 between Milepost 149 (where the officers were located) and Mileposts 114 to 122 (where they expected Chevron to arrive) is an unpopulated area. The officers testified that there were only 'a couple' of houses along this stretch of road. At least one of the officers obviously knew the local residents; he testified that he had recognized another car as belonging to a local resident.

"It is not reasonable to ignore the utter loneliness of the area in question. What might be 'unfounded' suspicion in a more populous area of this circuit can be very 'founded' suspicion in the barren desert of border Arizona. The round trip of a non-local camper on this stretch of Route 86, between 4:30 and 6:12 a.m., could not help but arouse the suspicion of any well-trained border patrolman. It is clear that officers 'may consider the characteristics of the area in which they encounter a vehicle', including its proximity to the border, traffic patterns, 'and previous experience with alien traffic.' *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–5, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). Mere presence near the border in a notorious smuggling area, at 6:40 a.m. when traffic was 'light', provided founded suspicion for the stop of a non-local vehicle in *United States v. Rocha-Lopez*, 527 F.2d 476 (9th Cir. 1976).

"The majority, in my view, fails to take the terrain and the time of day properly into account. Otherwise, they would not be stating that this case 'is quite closely related' to *United States v. Carrizoza-Gaxiola*, 523 F.2d 239 (9th Cir.1975). In that case, officers stopped a Ford LTD being driven by a Mexican-appearing driver, merely because they knew that Ford LTDs were popular among car thieves who sell them in Mexico. The stop was made solely on the 'profile' of LTDs being susceptible of car theft. The stop in *Carrizoza-Gaxiola* was made on Interstate 19, described accurately by Judge Wallace as 'a major highway between Nogales and Tucson'. I have grave difficulty accepting any comparison of Interstate 19 (at time unknown) with Route 86 between 4:30 and 6:12 a.m. The majority state that the camper, on its round trip on Route 86, during these hours, might have been visiting a small town. Granted. It was possible that this camper was making a round trip to Sells; but it is hardly probable. This conduct, like that in *United States v. Kandlis*, 432 F.2d 132, 136 (9th Cir.1970), was 'a very, very suspicious circumstance which justified further inquiry.' The test is reasonable, or founded, suspicion. This does not require that the behavior in question be inconsistent with innocence. *United States v. Blackstock*, 451 F.2d 908 (9th Cir.1970).

"The mere fact of a round trip at this time of day, in this location, given the notorious reputation of the area for alien smuggling, was sufficient to support the officers' claim of founded suspicion.

"But this information was clearly not the only information that these officers had. They had the further information of Chevron's modus operandi and form that information they had constructed a hypothesis as to his activities on the very night in question. Those pieces of information, even if they would not support founded suspicion when considered individually, surely supported founded suspicion when considered collectively. Each circumstance

gained its significance because of its presence with the others; their combined weight added up to founded suspicion. *United States v. Avalos-Ochoa*, 557 F.2d 1299 (9th Cir.1977); *United States v. Pulido-San Toyo*, 580 F.2d 352 (9th Cir.1978).

"*United States v. Brignoni-Ponce*, supra, recognizes the validity of permitting an officer 'to assess the facts in light of his experience in detecting illegal entry and smuggling'. In this case the officers, on the basis of their experience, put together a series of clues and concluded that there was a strong possibility that Chevron would bring a group of aliens across the border on this night and hour and place, and that he would be met by a vehicle of this sort, traveling in this direction. The clues, as they analyzed them, were absolutely correct in each detail. I fail to see that suspicion, based on this sort of skillful police analysis, can be called 'unfounded' within the test of *Brignoni-Ponce*."

*Cortez*, 595 F.2d at 508–11 (footnote omitted).