806 P.2d 1080

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Casey CREECH, Defendant–Appellant.**

**No. 11871.**

Court of Appeals of New Mexico.

Jan. 29, 1991.

Hal Stratton, Atty. Gen., Margaret B. Alcock, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Jacquelyn Robins, Chief Public Defender, Bruce Rogoff, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

MINZNER, Judge.

Defendant appeals his conviction of being a felon in possession of a firearm, contrary to NMSA 1978, Section 30–7–16 (Cum.Supp.1989). He claims as error: (1) denial of his motion to suppress evidence based on an allegedly unauthorized stop of the vehicle, in which he was a passenger, by a conservation officer of the Game and Fish Department; (2) exclusion of testimony tendered for the purpose of impeaching the officer's credibility; (3) refusal to allow defense counsel to argue to the jury that it could disregard its own determinations of fact and the law as instructed by the court to acquit; and (4) denial of his motion to quash the jury array on the ground that it was improperly selected.

We reverse defendant's conviction based on our determination that his motion to suppress should have been granted because the conservation officer lacked authority to make the stop under the circumstances of this case. In view of our disposition, we do not reach the remaining issues raised on appeal.

On November 13, 1988, conservation officer Hanson was on duty, driving in his patrol area, when he observed a truck traveling toward him on a state highway. The officer observed two men, defendant and a companion, seated behind the cab in the bed of the truck, both carrying rifles. Although there was disagreement about how Greg Johnson, defendant's companion, was holding his rifle, Hanson testified that Johnson's rifle was pointed toward oncoming traffic. Hanson engaged his emergency signals and stopped the truck. He asked Johnson and defendant if their guns were loaded, and he checked their hunting licenses. When he discovered defendant and Johnson had hitched a ride to their hunting camp but were headed in the wrong direction, he told them he would give them a ride to their camp.

Hanson later reported other events involving other hunters in defendant's party to the district attorney prosecuting citations issued to the other men. At that time, the officer discovered that defendant was a convicted felon. A warrant for defendant's arrest and search of his home was issued on the basis of Hanson's information that he had observed defendant in possession of a rifle. Defendant sought suppression of his identification as a prior felon on the ground that Hanson lacked reasonable suspicion to stop the vehicle. Defendant also argued at the suppression hearing that Hanson lacked statutory authority to make the stop.

At the suppression hearing, Hanson testified that he stopped the vehicle for two primary reasons: (1) as part of "standard operating procedure" to gather "biological information," *e.g.*, deer taken or sighted and census of hunters in the area; and (2) concern for the public safety arising from the way Johnson was holding his rifle. The officer also testified that he had no reason to believe that game laws were being violated prior to making the stop.

■ The state has argued that defendant, as a passenger in the vehicle, had no reasonable expectation of privacy in either the vehicle or its contents. The state relies on our holding in *State v. Waggoner,* 97 N.M. 73, 636 P.2d 892 (Ct.App.1981). The state's reliance is misplaced. Defendant does not challenge the search of the vehicle or the seizure of its contents; rather, he challenges the stop. In *Waggoner,* we determined that the defendants had no standing to challenge the search of a vehicle where they were passengers or the seizure of evidence found in the vehicle, relying in large part on *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (vehicle passenger has no standing to challenge search of vehicle). Both *Waggoner* and *Rakas* are concerned with the claimant's expectations of privacy in the vehicle or its contents. The state analogizes this case to *Rakas, Waggoner,* and *State v. Hensel,* 106 N.M. 8, 738 P.2d 126 (Ct.App.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987) (where defendant had no legitimate expectation of privacy in premises searched, he could not benefit from exclusionary rule). It argues that, because defendant had no reasonable expectation of privacy in the vehicle, he has no standing to challenge the stop of the vehicle.

However, the question here is not whether defendant had a recognizable privacy interest in the vehicle in which he was traveling, but rather whether defendant's personal rights guaranteed under the fourth amendment were infringed by an invalid stop. *See State v. Haworth,* 106 Idaho 405, 679 P.2d 1123 (1984) (investigatory stop is a seizure of the person); *see also State v. Scott,* 59 Or.App. 220, 650 P.2d 985 (1982) (whether or not passenger in van had reasonable expectation of privacy in passenger compartment of van, he had recognizable expectation of not being stopped by police in absence of reasonable suspicion a crime had been committed); *cf. Parkhurst v. State,* 628 P.2d 1369 (Wyo.), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981) (where the court concluded a passenger possesses an expectation of privacy regarding the seizure of his person). We are persuaded that defendant,

as a passenger in the car stopped, has standing to challenge the validity of the stop.

On appeal, defendant challenges the stop on the basis that Hanson was not authorized to stop the vehicle in which he had hitched a ride. There are two relevant statutory provisions. Under NMSA 1978, Section 17–2–19(A)(3) (Repl.Pamp.1988), a conservation officer has the authority to examine vehicles if he has reason to believe any game or fish has been illegally taken or held. Under Section 17–2–19(C)(2), a conservation officer may enforce either the Criminal Code or Motor Vehicle Code under emergency circumstances.

We note that the state did not actually rely on either Section 17–2–19(A)(3) or Section 17–2–19(C)(2) at the hearing on defendant's motion to suppress. Rather, the state argued that the stop was not subject to the usual rule that any detention be justified by reasonable suspicion of individualized wrongdoing. The state's argument appears to have been that the stop was a valid administrative inspection. *Compare City of Las Cruces v. Betancourt,* 105 N.M. 655, 735 P.2d 1161 (Ct.App.1987) (sustaining a sobriety roadblock and relying on California decision to the effect that such roadblocks are administrative inspections). However, the applicability of Section 17–2–19(C)(2) was briefed and argued orally on appeal, and we have addressed it in order to determine if the decision might be affirmed on an alternative ground. *State v. Beachum,* 83 N.M. 526, 494 P.2d 188 (Ct.App.1972) (trial court will be affirmed on appeal if right for any reason). We first address, however, the argument on which the state relied at the hearing.

■ Defendant contends that conservation officers have no greater authority than other law enforcement officers to stop a vehicle on the highway, and therefore they must be presented with facts leading to a reasonable suspicion that fish and game laws have been violated to justify any stop under Section 17–2–19(A)(3). Defendant relies on *State v. Galvan,* 90 N.M. 129, 560 P.2d 550 (Ct.App.1977), which holds that police officers must have a reasonable sus-

picion that the law has been or is being violated to warrant an investigation of possible criminal behavior. Reasonable suspicion is established when " 'specific articulable facts, together with rational inferences from those facts,' * * * provide the basis for the suspicion." *Id.* at 131, 560 P.2d at 552 (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968))).

The state contends that Hanson was not required to have reasonable suspicion within the meaning of *Galvan* to support the stop he made. Specifically, the state relies on *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), which held that police officers must have a reasonable suspicion to justify the stop of a vehicle, and thus, random discretionary stops to check driver's licenses and vehicle registrations are invalid, but which also stated that its decision did not prevent states from "developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion." *Id.* at 663, 99 S.Ct. at 1401. In a concurring opinion, Justices Blackmun and Powell added:

> I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

*Id.* at 664, 99 S.Ct. at 1401. Professor Wayne LaFave has also commented on the possibility of an exception:

> It is certainly correct that the balance struck in *Prouse* does not inevitably carry over to all other inspection procedures involving automobiles, and thus it cannot be disputed that a different result is conceivable as to random inspections by game wardens. It might be argued, for example, that the alternative means for enforcing the hunting and fishing laws are less effective than the alternative means noted in *Prouse* for dealing with highway safety.

4 W. LaFave, *Search and Seizure* § 10.8(e), at 85 (2d ed. 1987).

We note, however, that if reasonable suspicion is not present, the stop must "be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). *See also* 4 W. LaFave, *supra*, § 10.8(e) (stops made by game wardens without reasonable suspicion should be first authorized by a magistrate in order to impose limits as to time, area, and other factors). Here, there was no evidence of a plan embodying explicit neutral limitations on conduct. Endorsing an individual officer's standard operating procedure would conflict with the *Prouse* court's desire to limit the unbridled discretion of law enforcement officers. *Id.* 440 U.S. at 655, 99 S.Ct. at 1397.

> Police detention of a motor vehicle traveling on the highway constitutes a seizure, subject to the restrictions of the fourth amendment to the Constitution, applicable to the states through the fourteenth amendment. *See Delaware v. Prouse*, 440 U.S. 648 [99 S.Ct. 1391, 59 L.Ed.2d 660] (1979). Ordinarily such a detention is forbidden unless the officers detaining the vehicle have probable cause, or at least reasonable suspicion, to believe that the vehicle or its occupants are subject to seizure under applicable criminal laws. *See id.* Nevertheless, roadblocks operated for certain purposes pass constitutional muster if they are conducted in a constitutionally reasonable manner. *See City of Las Cruces v. Betancourt*, 105 N.M. 655, 735 P.2d 1161 (Ct.App.1987) (sobriety roadblock).
>
> The reasonableness of a roadblock provides a constitutionally adequate substitute for the reasonable suspicion that would otherwise be required to justify the detention of vehicles and the questioning of their occupants. *See id.*

*State v. Bolton*, 111 N.M. 28, 32, 801 P.2d 98, 102 (Ct.App.1990).

In some cases, statutory authority provides a constitutionally adequate substitute. *See State v. Keehner*, 425 N.W.2d 41, 44 (Iowa 1988) (holding that stop pursuant to statutory authority to check hunting licenses of " '[e]very person * * * while * * * hunting' " did not violate fourth amendment rights). Here, however, the state did not offer any evidence as to any such substitute.

Hanson testified that he stopped every vehicle in his patrol area to gather biological information, check for game law violations, and check for firearm safety practices. Although he testified he had been trained to do so since he began work as a conservation officer, there was no evidence of department practice or regulation authorizing his customary practice.

In *United States v. Munoz*, 701 F.2d 1293 (9th Cir.1983), a state game trooper and a biologist stopped all vehicles in their patrol area to check for wood cutting permits, conduct a brief interview, and check for possible game violations. The court found that "[t]he physical and psychological intrusion caused by this type of random stop 'to conduct a brief interview' and 'to check for possible game violations' is no less intrusive than a stop by a highway patrolman to conduct a license and registration check." *Id.* at 1300 (quoting *Delaware v. Prouse*, 440 U.S. at 657, 99 S.Ct. at 1398). Hanson's procedure of stopping all cars subjects motorists to the same intrusions: anxiety, interference with their freedom of movement, inconvenience, and consumption of time. As in *Munoz*, further, the state has failed to show that the interests it seeks to protect could not be achieved by less obtrusive means. Thus, the fourth amendment intrusion in this case is indistinguishable from *Prouse* or *Munoz*.

■ Under these circumstances, we are reluctant to construe Section 17–2–19(A)(3) to authorize the procedure Hanson testified he always followed. Rather, we believe the legislature intended Section 17–2–19(A)(3) as a limit on the authority of conservation officers and in using the phrase "reason to believe" should be understood to have required individualized suspicion. We note that the legislature specifically authorized checking stations or roadblocks "under the direction of the state game commission and the director of the department of game and fish." *See* § 17–2–19(C)(1). We view Section 17–2–19(C)(1), (2), and (3) as further evidence of the legislature's intent to limit the law-enforcement authority of conservation officers.

■ Defendant also contends that the manner in which Johnson was holding his rifle did not constitute an emergency circumstance within the meaning of Section 17–2–19(C)(2). We agree.

> An "emergency" has been defined as: A sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action without time for full deliberation.

Black's Law Dictionary 522–23 (6th ed. 1990). *Accord Dahl v. Turner*, 80 N.M. 564, 458 P.2d 816 (Ct.App.1969) (defining emergency for purposes of "good samaritan" statute, now codified as NMSA 1978, Sections 24–10–3, –4 (Repl.1986)); *People v. Smithtown General Hosp.*, 93 Misc.2d 736, 402 N.Y.S.2d 318 (1978) (defining emergency for purposes of determining whether defendant was engaged in the practice of medicine under emergency circumstances or was properly indicted for assault); *see also State ex rel. Gray v. Martin*, 29 Wash.2d 799, 189 P.2d 637 (1948) (defining "public emergency" as used in a city charter for purposes of excluding ordinances from challenge by referendum).

■ We conclude that there are three elements to an "emergency" as that term is used in Section 17–2–19(C)(2): (1) the gravity of the threatened harm; (2) the likelihood of the harm occurring; and (3) the lack of time in which action can be taken to avert the harm, especially whether it was feasible to summon a regular law enforcement officer. These factors must be considered from the conservation officer's

point of view. *See State v. Galvan,* 90 N.M. 129, 560 P.2d 550 (Ct.App.1977); *see also State v. Hall,* 90 N.M. 554, 566 P.2d 103 (Ct.App.1977). The question is whether the facts known to the officer would support a finding that there was an emergency. The facts and inferences are to be judged by an objective standard. *See id.*

We note that neither of the first two of the three factors we have identified is necessarily dispositive, unless it is completely absent. When the potential harm is great, a determination that an emergency exists may be based on a lesser likelihood of occurrence than when the potential harm is slight. Nevertheless, while the potential for harm from a gunshot wound is great, the likelihood of the harm occurring in this case was not sufficient to support a finding of emergency within the meaning of Section 17–2–19(C)(2). The stop occurred on lightly travelled Highway 24, and the record does not indicate that any other vehicle was present or that anyone was walking along the side of the road. There was nothing to indicate that the gun was especially likely to be discharged accidentally, and there was no evidence that Hanson had reason to believe Johnson would intentionally fire it.

Viewed in the light most favorable to the state, the facts in this case do not indicate that Officer Hanson was called to "immediate action" by "pressing necessity." Therefore, they would not support a finding of emergency. As a result, Section 17–2–19(C)(2) did not authorize Hanson to stop the truck.

In the absence of reasonable suspicion that the game laws had been violated or an emergency justifying enforcement of the Criminal or Motor Vehicle Codes, we conclude that the stop infringed defendant's fourth amendment rights. Because the conservation officer did not validly stop the vehicle in which defendant was a passenger, the trial court erred in refusing to grant his motion to suppress evidence. Therefore, we reverse defendant's conviction and remand the case to the trial court with instructions to suppress the evidence obtained as a result of the stop, *i.e.,* defendant's identification.

IT IS SO ORDERED.

BIVINS and CHAVEZ, JJ., concur.