692 P.2d 1174

STATE of Idaho, Plaintiff-Respondent,

v.

Arthur A. HOAK, Defendant,

and

Timothy J. Gawron,
Defendant-Appellant.

STATE of Idaho, Plaintiff-Respondent,

v.

Arthur A. HOAK, Defendant-Appellant,

and

Timothy J. Gawron, Defendant.

Nos. 14263, 14285.

Supreme Court of Idaho.

Dec. 7, 1984.

Klaus Wiebe, Ada County Public Defender, August H. Cahill, Jr., Boise, for appellants.

Jim Jones, Atty. Gen., and Lynn E. Thomas, Sol. Gen., Boise, for respondent.

DONALDSON, Chief Justice.

This case arose on the following facts: Between November 26, 1980 and November 29, 1980, a Boise home was burglarized resulting in a loss of approximately $60,000. The property taken included a 132-piece sterling silver set, a coin collection, a five-piece component stereo system, and miscellaneous items of jewelry. The burglary was discovered on November 29, 1980, by a neighbor who phoned the police. On November 28, 1980, the defendants, Arthur A. Hoak and Timothy J. Gawron, accompanied by two other men, George Jensen and Jack Wells, drove to Reno, Nevada. The four men checked into a Reno hotel and remained there until November 30, 1980. Gawron, Hoak and Jensen then returned to Boise.

During this time, Tanya Wells lived with her husband Jack Wells in Boise, Idaho. On either December 1 or December 2 of 1980, Mrs. Wells had a conversation with Detective Lance Anderson of the Boise Police Department about a component stereo system located at her house and about the November burglary. The exact content of this conversation was not revealed at trial nor at any of the preliminary stages of the case.

On December 2, 1980, Detective Anderson established surveillance of the Wells' home. At approximately 7:00 p.m. on December 2, 1980, George Jensen and the defendants were observed entering the Wells' home. After a brief time, the men left the Wells' home and proceeded to an area behind the home where a shed was located. The men then returned to the Wells' residence, and left about 15 minutes later in defendant Gawron's vehicle.

At 9:00 p.m. on the same evening, defendants Gawron and Hoak were arrested at Gawron's home by Detective Anderson. Anderson knocked on the door, identified himself, entered the house without consent, and placed both defendants under arrest. The arrest was effectuated without an arrest warrant. At that time, a cursory search of the premises was made by Detective Anderson, Detective Wood, and Sergeant Richardson, all of the Boise Police Department.

Detective Anderson transported the defendants to jail. The two remaining officers maintained custody of the premises while Anderson obtained a search warrant for defendant Gawron's residence, the Wells' residence, and a 1966 Chevrolet automobile. The search warrant was signed by the magistrate and executed at approximately 2:00 a.m. on December 3, 1980.

The following items were seized from defendant Gawron's home: à brown sack containing several pieces of ivory and a handwritten list of coins, a yellow piece of paper with a list of dates, a receipt for a bus ticket from Reno to Boise, two 1971 silver dollars, marijuana, a set of scales, a samurai sword, and an ivory seal found in a jewelry box. A brown cassette tape box with tapes was seized from defendant Gawron's car. A five-piece component stereo system was seized from the shed located behind the Wells' residence. The list of coins, ivory pieces, and the cassette tape box and stereo equipment were subsequently identified as items taken in the burglary.

The State filed its complaint on December 3, 1980, and after a preliminary hearing, both defendants were bound over to the district court on charges of Grand Larceny and Burglary II. Both defendants filed pretrial motions to suppress the evidence seized from defendant Gawron's residence, but those motions were denied. At trial, Jack Wells refused to testify even though he was ordered to do so by the trial judge and was granted immunity from prosecution. As a result of his refusal, the court allowed Wells' transcribed statement to be read to the jury under the "statement

against interest" exception to the hearsay rule.

The jury found the defendants guilty of Grand Larceny and not guilty of Burglary II. The trial court denied the defendants' motions for judgment of acquittal, and found both defendants guilty as charged. Defendants filed timely notice of appeal.

On appeal defendants assert that the trial court erred in two respects: first, in allowing the transcript of Jack Wells' out-of-court, unsworn statement to be read to the jury, and, second, in denying defendant Gawron's motion to suppress the evidence seized from his home. We will discuss each issue in turn.

## I.

Jack Wells was called as a state witness at trial. When asked if he had any contact with defendant Hoak on November 27, 1980, Wells responded that he did not remember and that he refused to make any statement. The jury was then excused and the judge informed Wells that he was required by law to testify. Wells reaffirmed his refusal and was held in contempt of court.

At this point, counsel for the state sought to introduce Wells' out-of-court, unsworn statement made to Detective Lance Anderson on December 9, 1980, at the Boise City Police Department. The trial judge held that portions of the statement were admissible under the "statement against penal interest" exception to the hearsay rule.

■■■ A statement against penal interest is defined as a statement which exposes the declarant to substantial criminal liability. McCormick on Evidence § 279, at 825 (3rd ed. 1984). The statement must be such "that a reasonable man in his position [the declarant's] believed it to be true." Fed.R.Evid. 804(b)(3). At common law, the statement against interest exception to the hearsay rule was generally confined to statements against the declarant's pecuniary or proprietary interest. Statements against penal interest were excluded. *See*

*Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913), and cases cited therein. The inclusion of declarations against penal interest under the Federal Rules of Evidence, Rule 804(b)(3), has given great impetus to broadening the exception to include such statements, however. McCormick, *supra*, § 278, at 823. Idaho has so extended the exception. *State v. Larsen*, 91 Idaho 42, 415 P.2d 685 (1966).

"The exceptions to the hearsay rule which permit certain types of hearsay to be admitted into evidence are based on the proposition that the evidence is likely to be truthful and may be highly probative. So it is that admissions against a pecuniary or proprietary interest made by a third party who is 'unavailable' as a witness are admissible because it is unlikely that the declarant would make statements which are adverse to his own interest. 5 Wigmore, Evidence §§ 1457–1475 (3rd ed.) We believe the same rationale applies to admissions against a penal interest. It is at least as probable that admissions which may subject oneself to criminal liability are as trustworthy as those which may subject oneself to financial liability." *Id.* at 49, 415 P.2d at 692.

■■■ The defendants assert that the admission of Wells' statement violated their right to confront the witnesses against them guaranteed by the sixth amendment to the United States Constitution. "In all criminal cases, the accused shall enjoy the right ... to be confronted by the witnesses against him ...." The sixth amendment right of confrontation is a fundamental right made obligatory on the states by the fourteenth amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965).

If read literally, the amendment would require the exclusion of any statement made by a declarant not present at trial. Thus applied, it would abrogate virtually every hearsay exception. The Supreme Court has stated that such a result was not intended and has rejected it as too extreme. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct.

2531, 2537, 65 L.Ed.2d 597 (1980). While the Confrontation Clause reflects a preference for face-to-face confrontation at trial, the Court has recognized that competing interests, such as a jurisdiction's interest in effective law enforcement, may warrant dispensing with confrontation at trial in some instances. *See Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934), *overruled, Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895).

The Court's focus has been to insure that there are sufficient "indicia of reliability" to afford the trier of fact a satisfactory basis for evaluating the truth of the statement. *Roberts*, 448 U.S. at 65–66, 100 S.Ct. at 2539. The Court has stated the test for admissibility as follows:

> "In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at 2539.

Thus, as this Court stated in *State v. Mee*, 102 Idaho 474, 479, 632 P.2d 663, 668 (1981), "the Supreme Court mandates an analysis on two fronts: whether the declarant is unavailable and whether the statement bears adequate guarantees of reliability and trustworthiness to allow it placed before the trier of fact."

■ Unavailability requires a showing that the prosecutor has made a good faith effort to obtain the witness' presence at trial. *Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543. Jack Wells was residing at the Oregon City Jail at the time of trial. He was flown to Boise by the Ada County Sheriff's

Office specifically to appear as a witness for the state and was granted immunity from prosecution. Upon his refusal to testify, he was ordered to do so by the trial judge. He maintained his refusal in the face of the judge's order and was thus held in contempt of court and remanded to the custody of the Ada County Sheriff until such time as he was ready to testify.

■ This Court has previously found that where a witness maintains his refusal to testify in spite of appropriate judicial pressure and in the face of immunity from prosecution, he is constitutionally unavailable. *State v. Mee*, 102 Idaho at 480, 632 P.2d at 669. *See also*, McCormick, *supra*, § 253, at 754 (great weight of authority holds witnesses' refusal to testify despite appropriate judicial pressures establishes unavailability for purposes of hearsay exceptions); Fed.R.Evid. 804(a)(2) (declarant unavailable where he persists in refusing to testify despite a court order to do so). Thus, we hold that Wells was unavailable and correspondingly that the first prong of the test for admissibility of his statement was satisfied.

■ The second prong of the test requires a determination of whether Wells' statement contained adequate guarantees of reliability and trustworthiness to allow it to be placed before the trier of fact. The statement consisted of a portion of an interview between Wells and Detective Lance Anderson at the Boise City Police Department in regard to Wells' knowledge of the burglary. The statement was inculpatory in that it tended to tie the defendants to certain items taken in the burglary and to transporting and selling stolen property. An inculpatory statement is one which implicates both the declarant and the defendant in criminal activity and which is admitted against the defendant. Comment, *Federal Rule of Evidence 804(b)(3) and Inculpatory Statements Against Penal Interest*, 66 Calif.L.Rev. 1189, 1190 n. 7 (1978).

Specifically, Wells stated that defendant Hoak showed him a bag containing silverware and coins and that he saw a stereo at

defendant Gawron's home. (Similar items were taken in the burglary.) Wells further stated that he drove the defendants and one George Jensen to Reno where the other three sold the silverware and coins at various pawn shops. Detective Anderson testified that Wells indicated to him that the items were "hot" although he denied all knowledge of the burglary.

■ Statements which tend to inculpate the accused must be carefully examined. The danger exists, particularly where the declarant is in police custody, that the statement was motivated by a desire to gain favor with the authorities in the hope of receiving a lesser charge or immunity from prosecution. Cross-examination in such instances is particularly important. *See U.S. v. Alvarez,* 584 F.2d 694, 701 (5th Cir.1978); J. Weinstein and M. Berger, Evidence ¶ 804(b)(3)[03], at 804–109 (1981). "It has been held that the fact of custody alone, with its attendant likelihood of motivation by a desire to curry favor with the authorities, bars a finding that the statement was against interest and requires exclusion." McCormick, *supra,* § 279, at 826 (citing *United States v. Sarmiento-Perez,* 633 F.2d 1092 (5th Cir.1980), *cert. denied,* 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 75 (1982). We note that while Wells was not under arrest at the time of making his statement, he was being interviewed by a police officer at a police station. The evidence demonstrates that the police were trying to persuade Wells to testify by dangling the prospect of immunity before him. The fact that Wells' statement was made under such circumstances suggests that it may have been motivated by a desire for immunity.

■ The Federal Rules of Evidence codify the exception for statements against interest in the following manner [1]:

"(b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

"(3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interests, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Fed.R.Evid. 804(b)(3).

The original advisory committee draft of the Federal Rules excluded inculpatory statements: "This example does not include a statement or confession offered against the accused in a criminal trial, made by a co-defendant or other person implicating both himself and the accused." 46 Fed.Rules Dec. 161, 378 (1969). As passed by Congress, however, the rule contained no specific reference to inculpatory statements.

The current approach under the federal rules, and under state evidence rules analogous to the federal rules, is to apply the corroboration requirement for exculpatory statements to situations involving inculpatory statements. *See U.S. v. Sarmiento-Perez,* 633 F.2d 1092; *U.S. v. Oliver,* 626 F.2d 254 (2nd Cir.1980); *U.S. v. Alzarez,* 584 F.2d 694; *State v. Parris,* 98 Wash.2d 140, 654 P.2d 77 (1982). Thus, under the current approach to the federal rules a statement offered to inculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

In sum, whether or not an inculpatory statement should be admitted appears to center on its trustworthiness, whether the statement bears sufficient "indicia of reliability." While Wells' statement does admit to knowing possession and transportation of stolen goods, and thus, is against his

---

**1.** Idaho has not adopted the Federal Rules of Evidence but is presently considering whether to adopt a set of rules substantially similar to the Federal Rules.

penal interest, it also serves to exclude him from the more serious charges of burglary or larceny. It appears very possible, from the evidence at trial, that Wells was a suspect in the burglary. He was acquainted with the defendants. He was present at defendant Gawron's home on the night the burglary is thought to have occurred and spent the next day (Thanksgiving) with the defendants. The component stereo system taken in the burglary was found in a shed in his back yard. In addition, he drove the defendants to Reno, in his car, allegedly to pawn some "hot" items, similar to those missing in the burglary.

 In light of the above facts, coupled with the fact that Wells' statement was made to a police officer, in a police station under a promise of immunity, we find that the statement was not sufficiently reliable to come within the statement against penal interest exception to the hearsay rule. Therefore, we hold that the trial court erred in admitting the statement.

 The State argues that even if Wells' statement was improperly admitted, the admission was harmless and did not amount to reversible error. The standard for determining whether an error of constitutional dimension is harmless is "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *State v. Le-Page*, 102 Idaho 387, 393, 630 P.2d 674 (1981) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

The effect of Wells' testimony was to connect the defendants with items matching the description of those taken in the burglary. The trial judge noted in his comments on the Renewed Post-Judgment Motions that:

"I think that the statement by Wells, was exceedingly important in both cases. I remember—and I believe it would be proper to mention for this record, that during our pre-trial conferences on these—on this case, involving these two Defendants, the Prosecutor was very concerned about getting ahold of Jack Lee Wells, and thought maybe he wouldn't have any case at all, unless he could get ahold of him. I mean, it's Wells that actually ties these two Defendants in with this burglary in a way that would give the jury very little choice but to convict them."

We agree with the trial court that Wells' statement was extremely important and, thus, we cannot say that its admission was harmless error beyond a reasonable doubt. Therefore, the judgment must be reversed and the case remanded for a new trial. We express no opinion as to the sufficiency of the evidence, without the inadmissible statement, to support a conviction for grand larceny. We do note, however, that the evidence, at the least, would support a charge of possession of stolen property.

## II.

The second issue is whether the district court erred in denying Gawron's motion to suppress evidence seized from his home. Gawron argues that the police unlawfully entered his home and arrested him there in violation of the fourth amendment of the United States Constitution. He claims that the evidence seized pursuant to a warrant which later issued was the "fruit of a poisonous tree" and ought to have been suppressed. The district court denied the motion to suppress on the grounds that exigent circumstances justified the warrantless entry. We conclude that the trial court erred in excusing the police conduct on the exigent circumstances rationale; however, we uphold its ruling because Gawron failed to show that the evidence seized was in any way tainted by the officers' unlawful acts.

 Under the exigent circumstances exception to the warrant requirement, the need to prevent the destruction of evidence is justification for what would otherwise be illegal police conduct. In this case the officers had probable cause to believe that stolen property would be found in Gawron's home. However, probable cause

to believe that stolen property is present on the premises does not automatically translate into exigent circumstances. The officers must have a reasonable belief that unless they act the evidence will be destroyed.[2]

■ There was no evidence to indicate that the stolen property was in any danger of being destroyed. Rather, the testimony reflects that the officers feared the defendants would attempt to remove the property and transport it to Reno. Since the house was under surveillance, it was unreasonable to assume that the defendants could successfully depart the premises or transport the goods without being apprehended. Absent exigent circumstances, there was simply no justification for the officers to "jump the gun" and enter the premises before the arrival, or at least the issuance, of a warrant.

■ Even though the officers' entry of Gawron's home was unlawful, we need not order the suppression of the evidence seized therein. Once the defendant has shown that a search or seizure was illegal, the question to be resolved is whether the evidence seized was "come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (citation omitted). Evidence is not excluded where the connection between the illegal police conduct and the discovery and seizure of the evidence is "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). For example, where the police had an "independent source" for the discovery, the evi-

dence seized is admissible. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), *overruled*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).

■ The United States Supreme Court in *Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), addressed the precise issue before us today of "whether, because of an earlier illegal entry, the fourth amendment requires suppression of evidence seized later from a private residence pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence."[3] The Court held

"that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as 'fruit' of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319] (1920)."

*Segura*, 104 S.Ct. at 3383.

Likewise, in the present case, suppression of the evidence is not justified unless the evidence was in some sense the fruit of some illegal governmental activity. The only evidence seized in Gawron's home which supports the felony charges was a paper bag containing several pieces of ivory and numerous silver coins. This evidence was not discovered until the officers

---

**2.** Probable cause to believe that contraband is in a hotel room is not sufficient for a warrantless entry where the agents had "little reason to suspect" that any evidence would be destroyed. *United States v. Allard,* 600 F.2d 1301 (9th Cir. 1979). A court has also found no exigent circumstances justifying a warrantless opening of a suitcase where four agents had three suspects at bay in a well lighted motel room. *United States v. Montano,* 613 F.2d 147 (6th Cir.1980).

See also 1 W. Ringel, Searches and Seizures, Arrest and Confessions, § 10.5(c) (1984).

**3.** In Part IV of the *Segura* opinion, *supra,* the Chief Justice joined by Justice O'Connor, stated that, under the fourth amendment, securing a dwelling on the basis of probable cause to prevent the destruction or removal of evidence while a search warrant is being obtained is not in itself an unreasonable seizure of either the dwelling or its contents. Because we hold that the evidence seized was admissible under the "independent source" doctrine, we need not decide whether the Idaho Constitution should be interpreted to allow such a seizure.

searched the premises pursuant to the warrant. The affidavit in support of the warrant clearly established probable cause to support the magistrate's conclusion that the evidence sought would be found at Gawron's home. The information set forth in the affidavit was obtained prior to, and independent of, the arrest, the warrantless entry and the cursory search. No evidence relating to the stolen property was obtained during the cursory search. Therefore, the evidence seized under the warrant was not obtained by exploitation of any illegality. Accordingly, we hold that the trial court did not err in denying Gawron's motion to suppress the evidence seized from his house.

The judgment of the trial court is reversed and this case is remanded for a new trial in accordance with the views expressed herein.

SHEPARD and HUNTLEY, JJ., and WALTERS, J. pro tem., concur.

HUNTLEY, Justice, specially concurring.

The majority initially upholds the trial court's denial of Gawron's suppression motion, "because Gawron failed to show that the evidence seized was in any way tainted by the officers' unlawful acts." I concur with this part of the analysis and believe that the analysis need go no further. However, the majority proceeds to cite *Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) for the proposition that evidence seized subsequent to an unlawful entry need not be suppressed when, despite the illegality, a lawful independent source would have allowed for its discovery and seizure. The majority then asserts, "we hold ... the evidence seized admissible under the 'independent source' doctrine."

The independent source rule does not come into consideration until the defendant has made a prima facie showing that a causal connection exists between the alleged fruit and the police misconduct. In *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the United States Supreme Court stated that the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality *or* instead by means sufficiently distinguishable to be purged of the primary taint." (emphasis added) In the instant case, it is clear that the evidence had not been come at by exploitation of the unlawful entry, hence we need not inquire whether some other doctrine (i.e., independent source, inevitable discovery) need apply. In the instant case, the independent source doctrine would operate only if the officers had actually discovered or seized evidence connecting defendant with the stolen property before the warrant issued. Had they done so, the defendant could have demonstrated that the evidence was tainted. At that point, the prosecution would have been compelled to demonstrate that the information leading to the issuance of the warrant and the ultimate seizure of the evidence was obtained from an independent source. However, the officers did not discover or seize any of the challenged evidence until *after* the warrant issued and was served. Since there was no taint, it is unnecessary to consider whether there was an independent source. The majority's quote from *Segura, supra*, is therefore surplusage.

I agree, however, with the view expressed in footnote 3 wherein the majority observes that we need not decide whether the Idaho Constitution should be interpreted in precisely the same fashion as the United States Supreme Court interpreted the federal constitution in *Segura, supra*.

BISTLINE, Justice, concurring and dissenting.

I concur in that much of the opinion for the Court where, in Part I, we hold inadmissible the hearsay testimony of Detective Anderson reciting the hearsay statements which Jack Wells allegedly told the detective concerning what Gawron had allegedly told Jack Wells. This is an outstanding example of hearsay upon hearsay upon unsworn hearsay. It is too much for my blood, not so much for the reasons stated,

with which I do agree, but also because of the outrageous nature of the beast.

The holding of the Court, with which I do agree, is that where the first hearsay declarant is in custody, or under suspicion, and where there is the danger of improper motivation—either an express or implicit promise of some reward in shekels or other prosecutorial favor—such evidence falls short of attaining any degree of reliability, thus precluding admissibility.

For my part, I would not give any consideration to such extreme use of hearsay. Short years ago this Court, in *State v. Villarreal*, 94 Idaho 246, 486 P.2d 257 (1971), ruled that sworn judicial testimony taken earlier in the same criminal case could not be used where the witness died and was unavailable at trial. A unanimous Court held that the Confrontation Clause of the United States Constitution so required. I would also add that this violates the due process requirements of the Idaho Constitution and an individual's fundamental right to a fair trial, recognized in a number of opinions. Ten years later, a more enlightened majority-of-three in a 3–2 opinion for the Court discarded *Villarreal, State v. Mee*, 102 Idaho 474, 632 P.2d 663 (1981), in favor of allowing use of the prior sworn preliminary hearing testimony where there was a right of cross-examination. Today four members of the Court, even more "enlightened" than in *Mee*, see no problems, generally, with the use of unsworn hearsay—a giant, giant step beyond *Mee*.

The opinion of the majority is, I believe, erroneous and will result in substantial and far reaching damage to *our* system of criminal justice. The majority fails to even mention or much less consider the enormous changes which its opinion will bring about in the prosecution of criminal cases in the State of Idaho. The majority opinion does not mention, much less discuss, the practical and policy considerations for the rule of exclusion nor the impact of today's decision.

Recognizing that many members of the bench and bar will see the language of the foregoing paragraph as somewhat superior to my earlier efforts over the past eight years, I hasten to admit that each of those sentences are not original with me, but have been borrowed from the dissent of Justice Shepard in *State v. Mee*, 102 Idaho 474, 632 P.2d 663 (1981). His prognostication of "substantial and far reaching damage to our system of criminal justice" which would result from the *Mee* majority opinion was fulfilled within two months after the remittitur went down. The trial court in this very case relied upon an isolated passage of the majority opinion as authority for denying the renewed motions (of these defendants) for judgment of acquittal, to set aside the verdict, and to dismiss for insufficiency of the evidence. Rather obviously, while the author of today's majority opinion, who was one of the three-member majority in *Mee*, mentions the case, he avoids any discussion of it, or of the accurate forecasting of Justice Shepard in that case.

A lesson is to be learned in observing the trial court's use of the *Mee* case in denying the defendant's post-conviction motions:

"During the trial in the above referenced case a statement by Jack Wells was read to the jury after it was found that Jack Wells was unavailable as a witness, due to his refusal to testify, and that the statement made was against his interest. Subsequently to the June 17, 1981, trial of Hoak and Gawron, the Idaho Supreme Court handed down its decision in *State v. Mee*, 1981 Opinion No. 93, July 21, 1981. The *Mee* case specifically addresses use of preliminary hearing transcripts where witnesses are unavailable and also addresses the reliability requirement before such testimony can be used.

"There was no constitutional breach of the right to confront witnesses in this case. The Idaho Supreme Court cited *McCormick* with approval where it states:

'When unavailability of the declarant is made a condition precedent to admitting his hearesay statement, a rule of preference is in fact being stated. His

personal appearance in court, under oath and subject to cross-examination, would be preferred. If, however, that cannot be had, then his hearsay statement falling within the particular hearsay exception, although admittedly inferior, is still to be preferred over doing entirely without evidence from that source. McCormick on Evidence § 253, P. 608 (2d ed.1972).'

*Mee,* 1981 Opinion No. 93 at 16. It was the correct ruling, in the opinion of the court, to allow the statement of Jack Wells into evidence as a declaration against interest in light of his unavailability."

The trial court correctly observed that *Mee* specifically addressed the use of preliminary hearing testimony at a subsequent trial where a witness was unavailable. Overruling the unanimous decision handed down but ten years earlier, *State v. Villarreal,* 94 Idaho 246, 486 P.2d 257 (1971), and which was still controlling case-law when these defendants were charged and tried, the three-member majority in *Mee* arrived at this holding:

"When the declarant is unavailable, but has previously testified in a judicial forum complete with oath, recordation, presence of the defendant and counsel, and adequate opportunity to cross-examine, that earlier testimony is admissible without violation of the confrontation clause of the United States Constitution." *Mee, supra,* 102 Idaho at 483, 632 P.2d at 672.

In the sentence immediately preceding that holding, the *Mee* majority, in philosophically meandering the feeling of the High Court, referred to this as the "former testimony hearsay exception," which it certainly is where the right of confrontation is not preserved. In this case, however, the prosecutor did not attempt to utilize the High Court's "former testimony hearsay exception," *even though blessed with a transcript of the preliminary hearing at which Wells did testify.* [A factor incredibly not observed in the majority's review of the record.] Apparently the prosecutor was aware of the *Villarreal* case, or con-

cluded that a harder blow could be struck by having Detective Lance Anderson recite to the jury the pertinent portions of out-of-court unsworn statements made to him by Wells at the police station.

The trial court's error was in placing reliance on the prosecutor's argument, as thought to be bolstered by *Mee,* that the right of confrontation could be circumvented by the "against penal interest" exception to the hearsay rule. As is readily seen, the trial court saw, recognized, but did not rely upon, the holding in *Mee,* but rather seized upon a partial excerpt from McCormick on Evidence. In doing so the trial court allowed itself to be prejudicially deceived. The author of *Mee,* in quoting from *McCormick,* omitted a most important concluding sentence to that particular paragraph, and even more invidiously, abstained from any mention of the paragraph immediately following, wherein Professor McCormick observes that:

"[U]navailability as a condition precedent to dispensing with personal presence and cross-examination of declarant is difficult to reconcile with the Confrontation Clause. *Either the accused is 'confronted with the witnesses against him' or he is not, and reasons why he is not confronted seem to have no place under the clause."* McCormick, at 608.

Hopefully it is thought that those who were part of the *Mee* majority will now have second thoughts if by chance they formed the *Mee* majority in reliance on the *partial* excerpt set forth in the Court's opinion, and in turn relied upon by the trial court in this case. In *Mee* I not only joined the forceful dissent of Justice Shepard, but also separately dissented from the overruling of *Villarreal* in the absence of "any illuminating reason for doing so." Accordingly, it would have served no useful purpose to then have individually examined all of the authority contained in the majority opinion, and, particularly the *McCormick* excerpt which, in my view, had nothing to do with the holding of the case, the single issue of which was "the propriety of admission of the prior preliminary hearing testi-

mony of a witness." *Mee, supra,* 102 Idaho at 475, 632 P.2d 663. Hence, in now reviewing *McCormick* I find it passingly strange that the author of *Mee* chose to utilize an abbreviated passage from Ch. 24, **The Hearsay Rule,** rather than Ch. 25, **Testimony Taken at a Former Hearing,** and specifically § 255 thereof, p. 616.

At the same time a rewarding effort is to turn to *McCormick,* Ch. 27, where, at p. 673, under § 278 he discusses the Penal Interest exception. If my hurried reading of this section is not in error, the rule is ordinarily brought in question in criminal cases where *the defense* attempts to place in evidence the declarations of third parties who claim credit for the commission of the offense of which the accused stands charged. *Mention is made* in fn. 31, p. 673 *of but one case* where the declarant's statement is offered against the accused.

In *State v. Larsen,* 91 Idaho 42, 415 P.2d 685 (1966), the Court reviewed the admissibility of alleged oral confessions of third parties, made out of court, which tended to exonerate the accused. The unanimous holding was that out-of-court third-party confessions could be admissible. The court cautioned, however, that such evidence would be admitted "only when there is other substantial evidence which tends to show clearly that the declarant is in fact the person guilty of the crime for which the accused is on trial." *Id.* at 49, 415 P.2d 685. Thus, *Larsen* stands for the principle that an out-of-court statement against penal interest by a third party can be used to exculpate a defendant. It does not stand for the proposition that an out-of-court statement against penal interest is admissible *against* a defendant. In the eighteen years since *Larsen,* the case has never been relied upon as a basis for using unsworn third-party statements inculpating an accused. In fact, in that eighteen years, it has not, prior to today, been cited even one time by this Court, and has only been cited by one other court. The holding of *Larsen* is sound. The out-of-court confession was there offered by the defendant in an effort to exonerate him. The Confrontation Clause was not involved because the evidence was offered in defense of the accused, *not against.* The Confrontation Clause is a protection to the defendant— not the government. On the other hand, any out-of-court third-party hearsay statement offered against the accused, as was the statement of Jack Wells in this case, is not admissible because the accused is deprived of his constitutional right of confrontation.

The majority today makes a gross and an unheard of misapplication of *Larsen.* The majority asserts that third-party statements against penal interest are admissible against an accused, asserting that this is hornbook law. What the majority has failed to recognize is that in *Larsen* the Court held that it was the accused who is to be given the benefit of third-party out-of-court statements against penal interest, providing there is some reliability. In the case before us today, it was the prosecution which was allowed use of the out-of-court statement against penal interest, the trial court not relying upon or mentioning *Larsen,* but instead erroneously relying upon dicta from *Mee.* The distinction is crucial. The Confrontation Clause is violated when the court allows in evidence such out-of-court third-party hearsay statements. The majority is guilty of failing to recognize the holding of *Larsen.* A commendable 1966 decision favorable to the case of an accused has been twisted out of context to work a constitutional derrogation of the Confrontation Clause.

If there were to be such an exception which would allow the prosecution to prove its case by hearsay declarants, even then there would have to be proof of trustworthiness—none of which was established or even attempted in this case. Jack Wells did take the stand, but *his* testimony went only so far as to establish that he was then presently incarcerated in the Oregon City Jail on robbery charges, to one of which he had plead guilty, that he had been furnished a ride from there to Boise in an Ada County Sheriff's airplane, and that he was scheduled to return after he testified. He admitted knowing defendant Hoak whom

he saw in the courtroom, and said that he understood "that the testimony you give here, is one that you are giving and that will not be held against you ...." Beyond that he said, not only that he would not testify, but also that he did not remember when asked if he had been in contact with Arthur Hoak on November 27, 1980. The court then ordered Mr. Wells off to jail until he was ready to testify. A recess was taken while waiting for the next witness, Detective Anderson, and the record shows an unreported chambers conference of court and counsel, in which, apparently, the penal interest exception was urged. With the jury absent, Mr. Anderson testified, as in the nature of an offer of proof, and was cross-examined by both counsel for respective defendants. At one point the examination went like this:

"Q. Now, when you talked to him on that particular occasion, or night, did you also tell him about the possibility that he was going to be charged with that also?

"A. I told him that he was bordering on areas that he could certainly be charged with, for Receiving, and Accessory After the Fact. However, I told him that as far as I was concerned, I would be more interested in having his testimony for the facts that he knew, and would speak to the Prosecutor's Office to see that he were granted immunity for any of the charges in lieu of his testimony.

"Q. And did you do that?

"A. Yes, I did.

"Q. And in a sense that you were instrumental in arranging the immunity deal that he worked out with the Prosecutor's Office?

"A. Yes, sir.

"Q. When you first talked to him, did he indicate to you what knowledge he actually had about the burglary itself?

"A. He made no mention of the fact that he had specific knowledge about the burglary." Tr., Vol. 2, pp. 230–31.

Following which the court ruled that Detective Anderson could testify to that which Wells told him he had seen, but not that which Anderson said that Wells said that Hoak or Gawron had said to him. Tr., Vol. 2, p. 232. Defense counsel continued to maintain that this was in violation of the confrontation clause, and denied them a right to effectively impeach Wells.

With the jury's return to the courtroom, Detective Anderson was allowed to testify in accordance with the court's ruling, and did so.

"Q. Would you state your full name, spelling your last name for the record?

"A. Lance Anderson. A–N–D–E–R–S–O–N.

"Q. Mr. Anderson, how are you currently employed?

"A. Detective with Boise City Police Department.

"Q. Calling your attention to the 9th day of December, 1980, were you at that time so employed?

"A. Yes, sir.

"Q. Calling your attention to that particular date, did you have occasion to come in contact with a Jack Lee Wells?

"A. Yes, I did.

"Q. Where did that take place?

"A. On December 9th, 1980?

"Q. Yes.

"A. It took place at the Boise City Police Department.

"Q. And did you have a conversation with Jack Lee Wells, at the Boise City Police Department.

"A. Yes, sir.

"Q. Which particular room was that in, if you recall?

"A. It was in an interview room that we have, within the Detective Division.

"Q. And who was present during that conversation?

"A. Mr. Wells and myself.

"Q. And do you recall at about what time that conversation took place?

"A. According to my report, it was at 1225 hours.

"Q. That would be 25 after noon?

"A. Yes, sir.

"Q. Calling your attention to that particular conversation that you had, did you make a transcript of that conversation?

"A. Yes, sir, I had the secretary do it.

"Q. I would like to read the pertinent portions of the transcript which you've been asked to read into the record at this time, if you would? Starting at the top where it says, 'This will be ...'.

"A. OK, I'll quote it then. It says, 'This will be an interview in regard to Department Report #025–310. I will be speaking with Jack Lee Wells. Jack's address is 10212 Mamie (phonetic). This is on the 9th day of December, 1980, at approximately 1225 hours.' I'll preface each of the quotes with either 'Jack', referring to Jack Wells, or 'Lance', referring to myself. Jack: 'Thanksgiving Day, Art called me up.' Lance: 'Do you recall about what time it was?' Jack: 'It was about 7:00 or 8:00 in the morning, so I went down, sat around with them in the house—sat around, you know, and ...' Lance: 'Which house are you talking about?' Jack: 'I can't think of the guy's name.' Lance: 'George?' Jack: 'Yeah, yeah,' Lance: 'OK. And this is George's place on Ponder?' Jack: 'Right.' Lance: 'OK.' Jack: 'And we settin' around talkin', and he goes ...—he opens up the bag, you know, pulls out some silver. I'm just goin', oh, at it again. That was it. We went out and had breakfast.' Lance: 'OK, let's— let me— I'll probably stop you and ask for more details from time to time on it. So this particular bag that Jack— or excuse me, this particular bag that Art showed you, can you describe this bag at all?' Jack: 'It was brown leathery.' Lance: 'How big would you say it was?' Jack: 'Oh fairly big, oh about 24 × 36.' Lance: 'OK, like a big carrying traveling bag?' Jack: 'Yeah.' Lance: 'Did he show you what was inside of it, then?' Jack: 'Yeah, I saw the silver.' Lance: 'OK, can you describe the silver in as much detail, and the different kinds of silver that you saw?' Jack: 'It was silverware— silverware, and I saw a bottle of quarters, a little medicine bottle with quarters.' Lance: 'OK, anything besides quarters?' Jack: 'Yeah, and nickels.' Lance: 'OK. Anything else in there besides that, that you can recall?' Jack: 'No, that's what I saw. That's what he showed me.' Lance: 'OK. Did you ever pick this bag up, like to tell how handy it was, or anything?' Jack: 'No, I never touched it.' Lance: 'Did it seem like it was full?' Jack: 'Yeah.' Lance: 'OK, then what did— what did Art, who was all— who was all present at that time?' Jack: 'Just George.' Lance: 'George, Art, and yourself?' Jack: 'Then we went out and had breakfast. We left and we went and got— went to the store and got some— got some stuff for Thanksgiving. And then we went back over to my house, and that day we was drinkin' and eatin' turkey and stuff. And that it was— for that day— you know, we all went to sleep well the next morning.' Lance: 'Thanksgiving morning?' Jack: 'No, Friday morning.' Lance: 'Oh, Friday morning.' Jack: 'Friday morning after Thanksgiving, Art's dad came over with some clothes for him to go to work. But he didn't go to work, so— so we went over to Tim's house.' Lance: 'Tim Gawron's?' Jack: 'Yeah, Tim's house. So we was sittin' around talkin' and that's when I saw the stereo. Well, after that, you know, started rappin' some more. We was talkin' back and forth. So we went down— so we went down to Reno.' Lance: 'OK. Who all went to Reno?' Jack: 'George, me, and Tim, and Art.' Lance: 'And did you take anything with you? It was your car?' Jack: 'It was my car, I just took my clothes I had on that day, and they took the bag.' Lance: 'The bag with all the silver in it?' Jack: 'Yeah. And that it was theirs, so we got pulled over in Winnemucca, you know. And they let us go there, you know, they checked the car out. And so we got down to Reno, and I started droppin' 'em off places to sell the stuff. And so I drove over to the pawn shops on 2nd Street, and there was about four or five of them on 2nd Street, and that's the places that they went.' Lance: 'What time would this have

been, then?' Jack: 'It would have probably—in the afternoon sometime, I think.' Lance: 'On Saturday?' Jack: 'Right, on Saturday.' Lance: 'OK.' Jack: 'And took them down, and they went to all four, five places of them, and got rid of the stuff. After getting rid of the stuff, you know, we went and parked the car, went up—went up to rent a motel for—spend dinner, and then we went and got a motel, and I don't recall the name of the motel, and we went up to the room. And after that, I took him out there, Mustang Ranch. I was just sittin' around when he left, and so I decided to just pick up and leave, so I got up and left. I went back to Portland to visit my family, and from there, I called my wife and told her to come on down. To meet me in Portland, and we'll drive back home together. So she came down, and we delayed by the snow on the hills, so we had to—' correction, '. . . so we had to stay at my parent's house for a couple of more days. OK, and when just got home two days ago.' Lance: 'OK, how much—how many trips did these guys make into the different shops in Reno where they sold the stuff, do you think?' Jack: 'It was four to five shops, taking turns, so it would be about 7 or 8 trips.' Lance: 'And so some of them would—one of them would go into one of the shops, and then he would come out, and then another guy would go in with some more stuff?' Jack: 'Yeah.' Lance: 'Into the same shop?' Jack: 'Yeah, into the same shop. And they hit four or five of 'em right there on 2nd.' Lance: 'OK, and then did you see how much money they collected, or about how much money they got from the sales of that stuff?' Jack: 'They got about $600 or $700 each.' Lance: 'You last saw over at Tim Gawron's house— is this at 1818 W. Idaho?' Jack: 'I think so. I'm not even sure of the address.' Lance: 'Where at, in the alley?' Jack: 'Yes, yeah.' Lance: "A little tiny house?' Jack: 'Yes, yes, that's it, yeah.' Lance: 'OK, can you describe this stereo at all? Do you remember what it looked like?' Jack: 'It's just a stereo, you know, I just glanced at it. You know, not really glanced, but I looked at it, you know, and that was it. It wasn't too interesting to me, that was just there.' Lance: 'Was it all one whole console set-up, or was it individual components, or . . .' Jack: 'I remember it was two individual.' Lance: 'Like a receiver and a turntable and something like that?' Jack: 'I don't remember of—any of that, you know. All I know is that it was two pieces, and there was a red and blue light on it, and that was it.' Lance: 'OK, and then was there speakers with it, also?' Jack: 'Yeah, 'cause they were playing it.' Lance: 'Today is Tuesday.' Jack: 'Tuesday, we got in there. Sunday—Sunday night, I think—Sunday night we got back to Boise, and my wife did.' Lance: 'OK, and then you indicated he had what appeared to be a diamond stone, and can you tell me anything more about that?' Jack: 'It was just a plain old stone. Weren't even sure if it was real or not.' Lance: 'OK. And there was something about some jewelry boxes, or antique jewelry boxes, do you recall seeing anything like that?' Jack: 'Yeah, they were wooden.' Lance: 'And where did you see those at?' Jack: 'I saw those in the bag, they pulled those out.' Lance: 'OK, this will be the end of the interview.'" Tr., Vol. 2, pp. 241–47.

The Chief Justice and those who join his opinion see the admission of the foregoing rank hearsay as of little moment, blithely holding that it should have been excluded only because it was unreliable. In further delving into the record, in fact, at its very conclusion, at p. 540, where the trial court was commenting after hearing argument on the Renewed Post-Judgment Motions, he was careful to intimate that if the hearsay was not admissible, its reception in his mind would not be harmless error:

"I think that that statement by Wells, was exceedingly important in both cases. I remember—and I believe it would be proper to mention for this record, that during our pre-trial conferences on these—on this case, involving these two Defendants, the Prosecutor was very concerned about getting a hold of Jack Lee Wells, and thought maybe he

wouldn't have any case at all, unless he could get ahold of him. I mean, it's Wells that actually ties these two Defendants in with this burglary in a way that would give the jury very little choice but to convict them. And his statement that he made to the officer, I think is crucial, even though there might be other evidence from which a jury could come to a conclusion that the Defendants, both of them, or either of them, were guilty. And certainly even if there was such other evidence from which a jury could come to a conclusion that either or both Defendants was guilty, they could not help but be influenced by the statement that Wells made to the officer, and not only that, but the whole aura of his guilt that surrounded the whole thing, due to the way the matter came up of his refusal to testify." Tr., pp. 540–41.

Consideration should also be paid to the prosecutor's use of the hearsay in his summation—in and of itself a sufficient predicate for a reversal. An officer of the court, he admonished the jury:

Ladies and gentlemen, I don't think that there's any question but that perhaps Jack Wells could be impeached as to statements, if you're going to just simply rely on the fact that he has a felony conviction. But there's a lot more at stake. You'll recall that Lance Anderson talked about immunity. You'll recall that when Jack Wells was called to the stand, he was given immunity. Immunity from prosecution, freed from prosecution. Don't speculate as to why that is. Jack Wells is going to be in jails for a long time with robbery. At any rate, immunity from prosecution, it takes away the reason to have to lie to cover up for yourself, because when you're given that immunity, you're not going to incriminate yourself, it's not going to be used against you. And so it takes away that taint. It takes away that ability to impeach, based on that prior felony, because the man has immunity, it's not going to be used against him. There's no reason for him to lie, he might as well tell the truth. And a convicted felon

isn't going to implicate others, unless it's absolutely true, and certainly he does there, doesn't want to be known as a snitch amongst felons. Tr., Vol. 3, pp. 512–13.

Although there was no objection raised to this argument, in considering the trial court's decision to allow the hearsay evidence of what Wells told Detective Anderson, in connection with the denial of the right of confrontation and the right of impeachment, one cannot be unmindful that it was improper for the prosecutor to argue in favor of the credibility of a witness who had not testified, and whose very reason for not repeating under oath that which he had said in unsworn statements may likely have been the threat of perjury charges if he lied. My present understanding of the law continues to be that a witness who has been granted immunity for certain past activity does not thereby gain immunity for lying while under oath. At any rate, Wells did not testify for whatever reason, and the prosecutor's comments, although not objected to, compounded the error committed in admitting the hearsay, and for that reason alone is properly before us in considering the prejudice to the defendants. From time to time this Court sua sponte considers fundamental error. It is gratifying to see the Court made a proper application of the doctrine of harmless constitutional error, which may be a first.

Just last year the Arizona Supreme Court had a similar case before it, *State v. Edwards*, 136 Ariz. 177, 665 P.2d 59 (1983). There, as in *Mee*, the trial court admitted prior testimony of a witness who had testified at that defendant's second trial. In addition to admirably dealing with the right of confrontation, the Arizona Court also was asked, as is becoming rather commonplace, to rule that the improperly admitted former testimony was harmless error. It concluded, citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that "there is certainly a reasonable possibility that the error contributed to the verdict ... [and] therefore cannot be considered harmless." 665 P.2d at 59. The

*Chapman* rule *is* still the recognized rule. We revisit *Chapman:*

"In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. What harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, so far as possible.

"The federal rule emphasizes 'substantial rights' as do most others. The California constitutional rule emphasizes 'a miscarriage of justice,' but the California courts have neutralized this to some extent by emphasis and perhaps overemphasis, upon the court's view of 'overwhelming evidence.' We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. State of Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Id., at 86–87, 84 S.Ct. at 230. Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error, this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. At the same time, however, like the federal harmless-error statute, it emphasizes an intention not to treat as harmless those constitutional errors that 'affect substantial rights' of a party. An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it

was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy v. State of Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy*, case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case." *Chapman, supra*, 386 U.S. at 21–24, 87 S.Ct. at 827–828.

If the Arizona Supreme Court and other state courts are obligated to, and do, apply the *Chapman* rule, then this Court, too, "before a federal constitutional error can be held harmless, must be able to declare a belief that it was harmless beyond a reasonable doubt." This in turn *does not mean* that this Court can speculate what a jury might have done absent the constitutional error committed, but rather requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Thus, the true test according to *Chapman* is deciding, as the Arizona Supreme Court noted in *Edwards, supra*, using language from *Chapman*, "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

*"Error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot,* under *Fahy, be conceived of as harmless."* *Chapman, supra,* at 23, 87 S.Ct. at 828. As a matter of simple deduction, the hearsay evidence here admitted was relevant, indeed so highly relevant that the prosecution had already remarked to the trial judge his thought that the state "wouldn't have any case at all" without his testimony. What I see today is a return to the proper rule—rather than the rule utilized in *State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981), where, in an aberration, we applied the Burger language of *Milton v. Wainwright,* 407 U.S. 371 at 378, 92 S.Ct. 2174 at 2178, 33 L.Ed.2d 1, *i.e.,* that without reasonable doubt the jury would have reached the same result even without the improper evidence.

## II.

I concur in the Court's opinion, Part II, insofar as we hold that the trial court erred in denying the motion to suppress on the grounds that exigent circumstances justified the warrantless entry, but from there I part company with the majority, conceding at the same time that I see valid reasoning in the separate opinion of Justice Huntley. The brief from the attorney general's office candidly reminds that the majority opinion in *State v. Gomez,* 101 Idaho 802, 623 P.2d 110 (1981), observed a split of authority concerning the effect of an unlawful entry where the premises are secured until a subsequent search is made pursuant to a valid warrant. State's Brief, p. 11. The brief goes on to provide us with those cases which go both ways. In *Gomez,* the Court went the way of the Arizona court. Being properly impressed with the Idaho Constitution and prior Idaho precedent and with the views of the California and Washington Supreme Courts, I disagreed with the path taken by the majority. *Gomez, supra* (Bistline, J., dissenting). Today the majority takes a further step down the same path it traveled before, mentioning *Segura v. United States,* —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599

(1984), without displaying that case for the monstrosity it is, and thus leaving an intimation to the trial bench and bar that there is nothing amiss with *Segura,* and that there is no reason to be mindful of our own Constitution, art. 1, § 17. It likely will not be a surprise to those faithful who follow this Court's opinions to note that the only mention of our Idaho Constitution's prohibition against illegal searches and seizures is found in the majority opinion's footnote 3. That discussion is limited to the sole observation that "we need not decide whether the Idaho Constitution should be interpreted to allow such a seizure." This is in error. The Supreme Courts of Washington and California both held that an unlawful securing of the premises does taint a subsequent warrant search and seizure—with which I previously agreed in *Gomez.*

From time to time I have mentioned *State v. Arregui,* 44 Idaho 43, 254 P. 788 (1927). *Arregui* made it indeed clear that the Idaho Court was well aware of its obligation to uphold the *independent* provisions of our Idaho Constitution, as well as complying with the obligation of upholding the Constitution of the United States. The Supreme Court of the United States has in recent years and on many occasions pointedly stated that although the various states are bound to apply the fourth amendment, and other fundamental rights guaranteed by the federal constitution, the states (through their own constitutions, laws, and courts) are free to fashion greater protections for their people than those federally afforded. Those cases are legion, some of which are readily available in *State v. Lang,* 105 Idaho 683, 689, 672 P.2d 561, 567 (1983) (Bistline, J., dissenting). Suffice it to say that many enlightened states have done so. Our Idaho legislature in the field of providing legal representation to indigents has dictated that those indigents accused of crime shall have representation of the caliber that those less unfortunate can obtain.

I have pointed with the pride of a native Idahoan to the *Arregui* decision, which in

point of time predated the concerned involvement of the United States Supreme Court in the area of search and seizure. Sixty years ago the *Arregui* Court could "see no such expediency for the enforcement of any law, as to justify violation of constitutional rights to accomplish it. The shock to the sensibilities of the average citizen when his government violates a constitutional right of another is far more evil than the escape of any criminal through the court's observance of those rights." 44 Idaho at 58, 254 P. at 792. In due time the High Court took up the same constitutional cudgel, but now in very recent times, with the High Court under a new stewardship, it has taken a turn to the contrary, changing the rules of the game in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). This Court in turn embraced those decisions, respectively, in *State v. Lang*, 105 Idaho 683, 672 P.2d 561 (1983), and in *State v. Haworth*, 106 Idaho 405, 679 P.2d 1123 (1984). In both of those cases I suggested that a wiser course might be a slower course. In short, I saw no valid reason to wholly surrender our own body of case-law attendant to our own Idaho Constitution in favor of new doctrines of the High Court which, after all, can only rule with respect to the federal constitution. For stated reasons I dissented in those cases, pointing out that *Gates* was premised on a false statement of facts, and only commanded a bare majority. Moreover, as I pointed out in *Lang*, and mentioned again in *Haworth*, the "totality of circumstances" doctrine of *Lang* was in essence that which had for almost sixty years been the guiding rule for magistrates issuing warrants in Idaho. The heart of my stance, however, is that *Arregui* is *our* case law. In *Lang* this Court was made aware that it was giving up our case law in favor of thereafter cloning to the changing vicissitudes of the High Court sitting in Washington. *See Lang, supra* (Bistline, J., dissenting).

Then four months later came *Haworth.* Here the majority, over my dissenting view, opted to apply the "totality" doctrine to a police officer's decision, an even more abject abdication of this Court's obligation to preserve and perpetuate the case law which had developed around art. 1, § 13. Worse yet, the *Haworth* majority did not give any consideration to either lines of federal case law or lines of Idaho case law which seemingly forbid application of new case law to pre-existing trials which have gone to judgment. *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1979); *Ivan v. City of New York*, 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972); *Solem v. Stumes*, —— U.S. ——, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984); *State v. Byers*, 102 Idaho 159, 627 P.2d 788 (1981); *State v. Mee, supra.*

Today's majority opinion continues this Court down that same pathetic path of abdication.

### Segura—A Wrong Path to Follow

That the majority mentions *Segura* without hesitation or equivocation, some will see as a continuation of accepting as gospel that which the High Court declares to be the present state of the law, a state of the law which fluctuates much in the manner as the stock market and is as subject to radical change. State courts are, of course, obliged to apply the holdings of the High Court as to what guarantees are provided by the Fourth Amendment. But again and needful of constant repetition, even though the High Court can whittle away at and crumble federal constitutional guarantees, it has itself many times conceded that it cannot affect state constitutional safeguards. So again, as I cautioned in *Lang* and then in *Haworth*, there is no need or reason to mention *Segura*, and leave the bench and bar to infer that the Court does not disapprove it. Contrariwise, the bench and bar surely would prefer that we establish our own body of constitutional law, which we can do under art. 1, § 13 of the Idaho Constitution. For my part, I see good reason for doing so, and am loath to be party to a philosophy

which for all practical purposes has forgotten that Idaho has its own constitution—no less sound than its federal counterpart, and more sound if this Court continues the tradition heralded by *Arregui.*

### An Analysis of Segura

My purpose at this point is not to dwell upon the invalidity of *Segura,* nor to discuss at length the reasons we should not bind Idaho to its holding. I suggest only that to my knowledge there has not been any analysis of *Segura,* and if there has been on this Court any discussion of its content and validity, I am wholly unaware of it. This case is a far, far cry from *Gates* and *Cortez.* Here we have the Chief Justice of the Supreme Court of the United States authoring an opinion which concedes "that there were no exigent circumstances to justify the warrantless entry into petitioner's apartment." And he immediately concedes as well that the initial search was illegal. Illegal in my vocabulary means unlawful, and unlawful means that government "peace" officers were breaking the law. The Chief Justice, however, without bothering to condemn the unlawful entry and the hostile occupation of the premises by the police "Task Force," in which the occupants were seized and forcibly evacuated from the premises, suggests that he can "see no reason" why a private residence may not be so invaded if the police see fit to do so. His holding, at p. 3389 of the 104 S.Ct. is that such police state conduct—bringing instantly to mind the unfettered and unchallenged Gestapo activities of Hitler's Germany—"is not itself an unreasonable search of either the dwelling or its contents" provided that a member of the "Task Force" has meanwhile been dispatched to request a search warrant so that that which has already been seized can then be searched. This is a monstrous proposition. If the people of this nation passively submit to such outrageous police conduct as the Chief Justice has now approved, then the people of this nation may very well live to see the day when, after World War II had ended, the German people asked themselves in retrospect, "How

did we ever allow ourselves to succumb to such a police-state government?"

Obviously the Chief Justice has placed the cart before the horse. Other than seizures which fall within the plain view exception to the warrant requirement, seizures will follow from searches—whether with warrant, or without warrant. Under *Segura,* however, the police may unlawfully force themselves into private residences, make unlawful arrests, remove all occupants, take over the premises, thereby, even as the Chief Justice admits, *seizing the entire dwelling and its contents,* and thereafter at their leisure conduct the search which constitutionally should have been made under a warrant, thereby properly leading to a seizure. For many years the law schools have conducted courses in "Search and Seizure." Those courses, if there remains any reason to teach them at all, will better be named "Seizure and Search."

The Chief Justice justifies this destructive assault on the federal constitution by the absurdism that he is "unwilling to believe that officers will routinely and purposely violate the law as a matter of course." This is exactly what the "Task Force" (an ominous title for what we in Idaho call peace officers) did in *Segura,* and is the same conduct which took place in the case before us. The Chief Justice indulges in two other nonsensical platitudes in defense of his opinion, and concludes with his clincher, that officers breaking into private premises without exigent circumstances justifying their action, "expose themselves to potential civil liability under 42 U.S.C. § 1983." Of course they do, and those citizens who choose to seek redress in that manner had best have a deep pocket to afford the luxury of tackling the bottomless resources of the United States and most states as well.

Such are but a few of the thoughts of a country lawyer who happens to be sitting on the highest court of Idaho. Others more capable will in due time render their criticisms of the *Segura* majority opinion. Whether or not the people of this nation no

longer desire the protections of the fourth amendment remains to be seen. But, I quaere, what of the rights guaranteed by art. 1, § 13 of our Idaho Constitution?

Even as we were receiving the *Segura* message, we were well advised of its fallacies and invalidity. The majority opinion of this Court issued today, which I do not join, barely deigns to mention that Chief Justice Burger's opinion is so outrageous that, of nine members who participated, only one joined his Part IV. Four members of the Court did not join any of the Chief Justice's opinion, but did join in a dissent authored by Justice Stevens. Unmentioned in our majority opinion, then, is that *Segura* —which a majority of our Court so quietly mentions, absent any analytical discussion of the opinion authored by Justice Stevens, and absent any reason for not giving any consideration to the pros and cons of applying Chief Justice Burger's rationale to our Idaho Constitutional provision, art. 1, § 17 —is essentially but a plurality-of-four opinion (although there were five votes to affirm). I would hope that were this Court to obtain requisite briefing from learned counsel throughout the state, including those involved in this very case, it would at least make a considered decision before jumping aboard what has been called the Burger Band Wagon. We heard oral argument in this case in February of this year. I have neither recollection nor record of any party since then having requested us to base our decision on *Segura,* and as I say, if the members of the Court have discussed *Segura,* such has been without my knowledge. One member of this Court has consistently declared that as a matter of sound appellate practice we should never hinge a decision on a new case without affording counsel the opportunity to brief and/or argue it. Here, although I would be quick to concede that it is to be much doubted that anyone could much improve upon Justice Stevens' criticism of the *Segura* majority, nevertheless, the opportunity to argue the Justice Burger philosophies against the Justice Stevens historical documentation should be afforded—in fact, required.

Since, on observing that a majority of this Court is willing to mention *Segura* without comment, and, in the realization that media coverage in judicial matters being what it is, it behooves me to at least invite the attention of those who faithfully read our opinions to point to some passages of Justice Stevens' opinion, with the hope that throughout the nation others are doing likewise. Otherwise, how is this gross inroad upon our federal and, in turn our state constitution to be brought home to the people? Justice Stevens wrote:

"Correct analysis of the Fourth Amendment issues raised by this case requires, first, a precise identification of the two constitutional violations that occurred, and second, an explanation of why a remedy for both is appropriate. While I do not believe that the current record justifies suppression of the challenged evidence, neither does it justify affirmance of petitioners' convictions. We must consider the substantial contention, supported by the findings of the District Court and left unaddressed by the opinion of this Court, that the authorities' access to the evidence introduced against petitioners at trial was made possible only through exploitation of both constitutional violations. Because I believe that contention must be addressed before petitioners' convictions are finally affirmed, I would remand for further proceedings. The Court's disposition, I fear, will provide government agents with an affirmative incentive to engage in unconstitutional violations of the privacy of the home. The Court's disposition is, therefore, inconsistent with a primary purpose of the Fourth Amendment's exclusionary rule—to ensure that all private citizens— not just these petitioners—have some meaningful protection against future violations of their rights.

. . . .

". . . Thus, it is uncontested that the warrantless entry of petitioners' apartment was unconstitutional. It is equally clear that the subsequent 18–20 hour occupation

of the apartment was independently unconstitutional for two separate reasons.

"First, the occupation was an unreasonable 'search' within the meaning of the Fourth Amendment. A 'search' for purposes of the Fourth Amendment occurs when a reasonable expectation of privacy is infringed. Nowhere are expectations of privacy greater than in the home. As the Court has repeatedly noted, 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' *United States v. United States District Court*, 407 U.S. 297, 313 [92 S.Ct. 2125, 2134, 32 L.Ed.2d 752] (1972). Of course, the invasion of privacy occasioned by a physical entry does not cease after the initial entry. In *Mincey v. Arizona*, 437 U.S. 385 [98 S.Ct. 2408, 57 L.Ed.2d 290] (1978), we held that although the police lawfully entered Mincey's home to arrest him, the Constitution forbade them from remaining in the home and searching it. The Court reasoned that despite the lawful initial entry, Mincey retained a constitutionally protected privacy interest in his home that could not be infringed without a warrant. See *id.*, at 390–391 [98 S.Ct. at 2412–2413]. Similarly, in *Chimel v. California*, 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685] (1969), we could 'see no reason why, simply because some interference with an individual's privacy and freedom of movement has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require.' *Id.*, at 766–767, n. 12 [89 S.Ct. at 2041–2042, n. 12]. Here, by remaining in the home after the initial entry, the agents exacerbated the invasion of petitioners' protected privacy interests. Even assuming the most innocent of motives, the agents' occupation of petitioners' living quarters inevitably involved scrutiny of a variety of personal effects throughout the apartment. Petitioners' privacy interests were unreasonably infringed by the agents' prolonged occupation of their home. THE CHIEF JUSTICE simply ignores this point, assuming that there is no constitutional distinction between surveillance of the home from the outside and physical occupation from the inside. THE CHIEF JUSTICE's assumption is, of course, untenable; there is a fundamental difference when there is a

'breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone which finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated.' " *Payton v. New York*, 445 U.S. 573, 589 [100 S.Ct. 1371, 1381, 63 L.Ed.2d 639] (1980).

"Second, the agents' occupation was also an unreasonable 'seizure' within the meaning of the Fourth Amendment. A 'seizure' occurs when there is some meaningful interference with an individual's possessory interests. There can be no doubt here that petitioners' possessory interests with respect to their apartment were subject to meaningful governmental interference. The agents not only excluded petitioners from access to their own apartment, and thereby prevented them from exercising any possessory right at all to the apartment and its contents, but they also exercised complete dominion and control over the apartment and its contents.

. . . .

" ... The cases THE CHIEF JUSTICE cites, *ante*, [104 S.Ct.] at 3387–3389, for the proposition that the Government may impound premises for the amount of time necessary to procure a warrant thus have no application to this case whatsoever. There is no contention that a period of 18–20 hours was even remotely necessary to procure a warrant. The contrast between the 90 minute duration of the seizure of a piece of luggage held unreasonable in [*United States v.*] *Place* [462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110] and the 18–20 hour duration of the seizure of the apartment and its contents in this case graphically illustrates the unreasonable character

of the agents' conduct. Moreover, unlike *Place*, which involved a seizure lawful at its inception, this seizure was constitutionally unreasonable from the moment it began. It was conducted without a warrant and in the absence of exigent circumstances. It has been clear since at least *Chimel v. California*, 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685] (1969), that the police may neither search nor seize the contents of a home without a warrant. There is simply no basis for concluding that this 18–20 hours warrantless invasion of petitioners' home complied with the Fourth Amendment. Because the agents unreasonably delayed in seeking judicial authorization for their seizure of petitioners' apartment, that seizure was unreasonable.

"Nevertheless, in what I can only characterize as an astonishing holding, THE CHIEF JUSTICE, joined by JUSTICE O'CONNOR, concludes that the 18–20 hours seizure of the apartment was not unreasonable. He advances three reasons for that conclusion, none of which has any merit.

"First, he seeks to justify the delay because 'the officers focused first on the task of processing those whom they had arrested before turning to the task of securing the warrant.' *Ante*, [104 S.Ct.] at 3390. But there is no evidence that this task presented any difficulties; indeed, since the arrest of the occupants itself was unconsti-

tutional, it is truly ironic that THE CHIEF JUSTICE uses one wrong to justify another. ...

"Second, THE CHIEF JUSTICE suggests that it is relevant that the officers did not act in 'bad faith.' *Ante*, [104 S.Ct.] at 3382–3383, 3390. This is done despite the fact that there is no finding as to whether the agents acted in good or bad faith; the reason is that the litigants have never raised the issue. More important, this Court has repeatedly held that a police officer's good or bad faith in undertaking a search or seizure is irrelevant to its constitutional reasonableness, and does so again today.

"Finally, and 'most important' to his conclusion, THE CHIEF JUSTICE suggests that there was no significant interference with petitioners' possessory interests in their apartment because they were in custody anyway. *Ante*, [104 S.Ct.] at 3390–3391. The cases are legion holding that a citizen retains a protected possessory interest in his home and the effects within it which may not be infringed without a warrant even though that person is in custody. ...

....

"Every time a court holds that unconstitutionally obtained evidence may not be used in a criminal trial it is acutely aware of the social costs that such a holding entails.[1] Only the most compelling reason

---

1. "Justice Holmes commented on this dilemma:
 " 'We must consider the two objects of desire, both of which we cannot have, and make up our mind which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. If it pays its officers for having got evidence by crime I do not see why it may not as well pay them for getting it in the same way, and I can attach no importance to protestations of disapproval if it knowingly accepts and pays and announces that in future it will pay for the fruits. We have to choose, and for my part I think it a lesser evil that some criminals should escape than that the Government should play an ignoble part.' *Olmstead v. United States*, 277

U.S. 438, 470 [218 S.Ct. 564, 575, 72 L.Ed. 944] (1928) (dissenting opinion).'
"Justice Stewart has written that:
 'the Framers did not intend the Bill of Rights to be no more than unenforceable guiding principles—no more than a code of ethics under an honor system. The proscriptions and guarantees in the amendments were intended to create legal rights and duties.
 " 'The Bill of Rights is but one component of our legal system—the one that limits the government's reach. The primary responsibility for enforcing the Constitution's limits on government, at least since the time of *Marbury v. Madison*, has been vested in the judicial branch. In general, when law enforcement officials violate a person's Fourth Amendment rights, they do so in attempting to obtain evidence for use in criminal proceedings. To give effect to the Constitution's prohibition against illegal searches and sei-

could justify the repeated imposition of such costs on society. That reason, of course, is to prevent violations of the Constitution from occurring.

"For me, however, the controlling question should not be answered merely on the basis of such speculation, but rather by asking whether the deterrent purposes of the exclusionary rule would be served or undermined by suppression of this evidence. That is the appropriate 'prudential' consideration identified in our exclusionary rule cases. The District Court found that there was a distinct possibility that the evidence was preserved only through an illegal occupation of petitioners' apartment. That possibility provides a sufficient reason for asking whether the deterrent rationale of the exclusionary rule is applicable to the second constitutional violation committed by the police in this case.

. . . .

"The importance of applying the exclusionary rule to the police conduct in this case is underscored by its facts. The 18–20 hour occupation of petitioners' home was blatantly unconstitutional. At the same time, the law-enforcement justification for engaging in such conduct is exceedingly weak. There can be no justification for inordinate delay in securing a warrant. Thus, applying the exclusionary rule to such conduct would impair no legitimate interest in law enforcement. Moreover, the deterrence of the rule is plainly applicable. The agents impounded this apartment precisely because they wished to avoid risking a loss of access to the evidence within it. Thus, the unlawful benefit they acquired through the impoundment was not so 'attenuated' as to make it unlikely that the deprivation of that benefit through the exclusionary rule would have a deterrent effect. To the contrary, it was exactly the benefit identified by the District Court— avoiding a risk of loss of evidence— that

motivated the agents in this case to violate the Constitution. Thus, the policies underlying the exclusionary rule demand that some deterrent be created to this kind of unconstitutional conduct. Yet the majority's disposition of this case creates none. Under the majority's approach, the agents could have remained indefinitely—impounding the apartment for a week or a month—without being deprived of the advantage derived from the unlawful impoundment. We cannot expect such an approach to prevent similar violations of the Fourth Amendment in the future.

. . . .

"The Government did not contest the blatant unconstitutionality of the agents' conduct in this case. Nevertheless, today's holding permits federal agents to benefit from that conduct by avoiding the risk that evidence would be unavailable when the search warrant was finally executed. The majority's invocation of the 'enormous price' of the exclusionary rule and its stated unwillingness to 'protect criminal activity,' *ante*, [104 S.Ct.] at 3392, is the most persuasive support that the Court provides for its holding. Of course, the Court is quite right to be ever mindful of the cost of excessive attention to procedural safeguards. But an evenhanded approach to difficult cases like this requires attention to countervailing considerations as well. There are two that I would stress.

"First, we should consider the impact of the Court's holding on the leaders of the law enforcement community who have achieved great success in creating the kind of trained, professional officers who deservedly command the respect of the communities they serve. The image of the 'keystone cop' whose skills seldom transcended the ham-handed employment of the 'third degree' is largely a matter of memory for those of us who lived through the 1920s, 1930s, and 1940s. For a congery of

zures, it may be necessary for the judiciary to remove the incentive for violating it. Thus, it may be argued that although the Constitution does not explicitly provide for exclusion, the need to enforce the Constitution's limits on government—to preserve the rule of law—requires an exclusionary rule.' Stewart, The

Road to *Mapp v. Ohio* [367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)] and Beyond: The Origins, Development and Future of the Exclusionary Rule, 83 Colum.L.Rev. 1365, 1383–1384 (1983)."
*Segura, supra,* 104 S.Ct. at 3398, n. 21.

reasons, among which unquestionably is the added respect for the constitutional rights of the individual engendered by cases like *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), and *Mapp v. Ohio*, 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961), the professionalism that has always characterized the Federal Bureau of Investigation is now typical of police forces throughout the land. A rule of law that is predicated on the absurd notion that a police officer does not have the skill required to obtain a valid search warrant in less than 18 or 20 hours, or that fails to deter the authorities from delaying unreasonably their attempt to obtain a warrant after they have entered a home, is demeaning to law enforcement and can only encourage sloppy, undisciplined procedures.

"Second, the Court's rhetoric cannot disguise the fact that when it not only tolerates, but provides an affirmative incentive for warrantless and plainly unreasonable and unnecessary intrusions into the home, the resulting erosion of the sanctity of the home is a 'price' paid by the innocent and guilty alike.[2] More than half a century ago, Justice Holmes explained why the Government cannot be permitted to benefit from its violations of the Constitution.

'The Government now, while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had.

" 'The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage the Government now regrets, ... the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act .... In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391–392 [40 S.Ct. 182, 183, 64 L.Ed. 319] (1920) (citation omitted).'

"If we are to give more than lip service to protection of the core constitutional interests that were twice violated in this case, some effort must be made to isolate and then remove the advantages the Government derived from its illegal conduct.

"I respectfully dissent."

*Segura, supra*, 104 S.Ct. at 3392–3405 (Justice Stevens dissenting) (footnotes omitted, other than nos. 21 and 31).

## CONCLUSION

As Marie Antoinette said, "Let the beggars eat cake," Chief Justice Burger says of governmental law-breaking, "Let the whiners bring suit." For my part, I would hope that national reaction will be to turn to the words of Justice Jackson (uttered a short time after returning from an extended stay in post-war Germany), that a "search against Brinegar's car must be re-

2. "The words of Justice Jackson that this case calls to my mind are not those of his *Nardone* [*v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307] dissent, *ante*, [104 S.Ct.] at 3392, but rather those in two of his other dissents. With respect to the claim that the Fourth Amendment 'protect[s] criminal activity,' he wrote: 'Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted .... Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently

are guilty .... So a search against Brinegar's car must be regarded as a search of the car of Everyman.' *Brinegar v. United States*, 338 U.S. 160, 181 [69 S.Ct. 1302, 1313, 93 L.Ed. 1879] (1949). And with respect to the 'price' exacted by the exclusionary rule, he wrote: '[T]he forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensible to individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught.' *Harris v. United States*, 331 U.S. 145, 198 [67 S.Ct. 1098, 1120, 91 L.Ed. 1399] (1947)." *Segura, supra*, 104 S.Ct. at 3404, n. 31.

garded as a search of the car of Everyman." And, "They [the founding forefathers] may have overvalued privacy, but I am not disposed to set their command at naught." Just as Justice Holmes in 1928 believed "it a lesser evil that some criminals should escape than that the Government should play an ignoble part," and as a year earlier Justice Herman Taylor said for this Court in 1927, "The shock to the sensibilities of the average citizen when his government violates a constitutional right of another is far more evil than the escape of any criminal through the court's observance of those rights," I am wholly aghast that a majority of the Supreme Court of the United States has openly provided—not just condoned—an incentive for warrantless and plainly unreasonable and unnecessary intrusions into the home—a price to be paid by innocent and guilty alike. I am delighted to read the plurality opinion of Justice Stevens, a philosophical dissertation long over-due from someone on the High Court, and a work that well illustrates that this Court in *Gomez* should have followed the leadership of the Washington, California, and other enlightened courts.